**Zaher EL–ALI, Petitioner,**

v.

**The STATE of Texas, Respondent.**

No. 13–0006.

Supreme Court of Texas.

March 28, 2014.

Nathan Smith, Matthew R. Miller, Michael Kenan Oldham, Scott G. Bullock, for Petitioner.

Lisa Gail Porter, John Robert Skrabanek, Suzanne L. Hanneman, for Respondent.

Justice BOYD, joined by Justice GUZMAN, concurring in the denial of the petition for review.

The opinion dissenting to the Court's denial of this petition for review is both eloquent and persuasive. I agree that the State of Texas should not "ensnare guiltless citizens and seize their homes and other property." But courts resolve cases, not just issues, and this case presents a particularly poor opportunity to resolve the issues that disturb the dissent.

To prevail in this case, petitioner Zahir El-Ali bears a difficult legal burden. The Texas civil forfeiture statute allows the State to seize and take private property if the State proves that the property was used, or was intended to be used, in or to facilitate the commission of certain crimes, or that the property constitutes the proceeds from the commission of certain crimes. TEX.CODE CRIM. PROC. art. 59.01(2), 59.02(a). Ali argues that this statute is unconstitutional because it does not also require the State to prove the property owner knew or should have known of the illegal conduct. This Court has already rejected that exact argument. *See State v. Richards*, 157 Tex. 166, 301 S.W.2d 597, 603 (1957) (holding that the forfeiture statute is not unconstitutional "as applied to the property rights of an innocent owner who entrusts his vehicle to another"). And many other courts, including the United States Supreme Court, have rejected it as well. *See, e.g., Bennis v. Michigan*, 516 U.S. 442, 446, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996) (reaffirming the "long and unbroken line of cases [that] holds that an owner's interest in property may be forfeited by reason of the use to which the property is put even though the owner did not know that it was to be put to such use").[1]

Certainly, we could decide to overrule *Richards* and reject the reasoning of the "long and unbroken line of cases" that the

---

1. As the dissent notes, Ali bases his challenge on the Texas Constitution's due course of law provision rather than the U.S. Constitution's due process clause. But Ali does not identify any difference between the two that is material to the issue in this case, and under such circumstances "we treat them as the same." *In re E.R.*, 385 S.W.3d 552, 566 n. 25 (Tex. 2012) (citing *Nat'l Collegiate Athletic Ass'n v. Yeo*, 171 S.W.3d 863, 867–68 (Tex.2005)). In fact, instead of distinguishing the federal clause, Ali's briefs address a national problem and cite federal as well as Texas decisions. His opening brief does not mention *Bennis*, but instead quotes from Justice Thomas's dis-

sent in *United States v. James Daniel Good Real Property*: "Given that current practice under [the federal forfeiture statute] appears to be far removed from the legal fiction upon which the civil forfeiture doctrine is based, it may be necessary—in an appropriate case—to reevaluate our generally deferential approach to legislative judgments in this area of civil forfeiture." 510 U.S. 43, 82, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (Thomas, J., dissenting). I do not disagree with most of the concerns that Justice Thomas and this Court's dissenting opinion raise, I simply conclude that this is not "an appropriate case" in which to address them.

United States Supreme Court has reaffirmed. But Ali does not ask us to do that. Instead, he notes that the Texas statute now provides an "innocent owner defense," which enables the property's owner to avoid forfeiture by proving that the owner "did not know or should not reasonably have known" that the property was being used illegally. TEX. CODE CRIM. PROC. art. 59.02(c). Having decided to protect the rights of innocent owners, Ali asserts, the State may not constitutionally require him to prove his own innocence; instead, the State must prove that he is not innocent. The State, of course, contends that this just gets us back to the argument we rejected in *Richards:* if the owner's innocence is irrelevant to the statute's constitutionality, then the burden of proving the owner's innocence is likewise irrelevant.

Even if Ali's reliance on the enactment of the article 59.02(c) defense is sufficient to distinguish *Richards,* it creates significant procedural and jurisdictional issues. Although Ali's brief assures us that he is "wholly innocent of any wrongdoing," he refused in the trial court to offer any evidence, even a simple affidavit, to support that claim. More importantly, he amended his pleadings to specifically abandon any reliance on the article 59.02(c) defense. Yet in this appeal, he challenges the constitutionality of article 59.02(c), the very statute on which he has refused to rely. The State contends that, by abandoning any reliance on article 59.02(c), Ali has mooted, and now lacks standing to assert, any challenge to that article's constitutionality.

Although the dissent urges us to apply "21st-century scrutiny" in light of the current "prevalence, procedures, and profita-

bility" of 21st-century forfeiture practices, I'm confident that the dissent is not suggesting that the words of the Constitution mean something different from what they meant in 1957. So we are left in this case with either overruling *Richards* or distinguishing it based on a statutory provision upon which the petitioner intentionally does not rely. Although I share the Court's desire that the State not become like old Mother England, I'm not convinced that, in this case, we should consider either option.

Finally, by calling for "21st-century scrutiny" and "modern study," the dissenting opinion could be read to suggest that the Court has not studied and scrutinized these issues when deciding, today, whether to grant this petition for review. I write in response to the dissent mainly to confirm that we certainly have.

Justice WILLETT, joined by Justice LEHRMANN and Justice DEVINE, dissenting to the denial of the petition for review.

This is the story of a Chevrolet truck, but to some observers it evokes less Chevy than Kafka. The modern Texas asset-forfeiture regime bears little resemblance to what we reviewed in 1957 when we last visited this subject.[1] In my view, the civil-forfeiture realities of 2014—the prevalence, procedures, and profitability—compel us to reexamine the constitutional protections due innocent property owners.

The stakes are grave indeed, as asset-forfeiture cases threaten not merely property but, more fundamentally, property *rights,* something we have recently (and unanimously) extolled as essential to "freedom itself."[2] Civil forfeiture springs from

---

1. *State v. Richards,* 157 Tex. 166, 301 S.W.2d 597 (1957).

2. *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline–Tex., LLC,* 363 S.W.3d 192, 204 (Tex.2012).

the Legislature's broad police power,[3] but as we recently made clear, police power cannot go unpoliced.[4]

Put simply, this important subject deserves attentive constitutional reconsideration, if not recalibration. Much has changed since our Eisenhower-era decision in *State v. Richards*. Forfeiture 2014–style is not forfeiture 1957–style. But even if the Court were to reaffirm its ruling from 57 years ago that due process is unoffended, 21st-century practice merits 21st-century scrutiny. If the State of Texas wants to ensnare guiltless citizens and seize their homes and other property, it must do so—always—within the bounds of our Constitution.

\*     \*     \*

The pertinent facts are undisputed. Zaher El–Ali ("Ali") owned a 2004 Silverado pick-up. He held title to the truck, and it was registered in his name, but he was selling it to someone who was still making payments. The buyer, while driving the truck, was arrested for driving while intoxicated, evading arrest, and possessing cocaine. Ali was neither in the truck nor involved in the crime. The State, however, seized the vehicle and filed a civil-forfeiture proceeding against it: *State of Texas v. One 2004 Chevrolet Silverado*.

Under Section 59.02(c) of the Texas Code of Criminal Procedure, Ali bore the burden of proving that he was innocent of the crime [5]—that is, he was required to prove a negative: that he "did not know or should not reasonably have known" that his truck was being used illegally.[6] If Ali fell short, law enforcement officials could either use the truck or sell it, keeping the proceeds.

Asset forfeiture is increasingly routine. The current Texas civil-forfeiture law, enacted in 1989,[7] greatly expanded both the scope of forfeiture (now including most felonies and some misdemeanors) and the types of property that can be seized (now including homes, land, vehicles, etc.). The government's burden is slight while the citizen's burden is significant. Law enforcement can seize property it believes is "contraband," [8] something it need only show by a preponderance of the evidence.[9] If the property owner doesn't answer the State's forfeiture action, the State keeps the seized property. If the owner has the wherewithal to challenge the seizure, he can assert an "innocent owner" defense, which requires him to prove he "did not know or should not reasonably have known of the [allegedly criminal] act or omission." [10] In this case, Ali initially raised innocent-owner status, but he later dropped that argument, he explains, "because it placed the burden of proof on him, not the government, and he believed that requiring him to prove his innocence was unconstitutional."

---

**3.** *Richards*, 301 S.W.2d at 600.

**4.** *Robinson v. Crown Cork & Seal Co., Inc.*, 335 S.W.3d 126 (Tex.2010).

**5.** Tex.Code Crim. Proc. art. 59.02(c). There are two types of forfeiture actions: criminal and civil. With criminal forfeiture, government seizes property only after its owner has been found guilty. With civil forfeiture, owners need not be convicted of a crime, or even charged with one, before government can seize their homes, cars, cash, or other property.

**6.** *Id.*

**7.** Act of July 19, 1989, 71st Leg., 1st C.S., ch. 12, § 1, 1989 Tex. Gen. Laws 14 (codified at Tex.Code Crim. Proc. art. 59).

**8.** Tex.Code Crim. Proc. art. 59.02(a).

**9.** *Id.* at art. 59.05(b).

**10.** *Id.* at art. 59.02(c)(1).

Ali argues that the burden placed on owners to prove their innocence violates his due-process rights under Article 1, Section 19 of the Texas Constitution. The lower courts both ruled for the State, with the court of appeals dutifully noting our 1957 decision in *Richards,* which held that the Texas Constitution does not protect innocent property owners from having their property forfeited. The court of appeals held: "even if the Supreme Court of Texas would not decide this case today the same way it decided *Richards* in 1957, that is a decision for that court and not this one." [11]

We have not examined the rights of innocent property owners in more than half a century. Back then, the Dodgers were still in Brooklyn, *American Bandstand* premiered on network TV, Sputnik blasted off, and President Eisenhower sent federal troops to integrate Central High School. Asset forfeiture in 1957 was exceedingly narrow. Fast-forward 57 years, and forfeiture is ubiquitous given the sweep of expanded state and federal laws and, most fatefully, the direct profit incentive baked into them. Indeed, it was the earmarking feature added in 1989 that sparked the explosion in Texas forfeiture actions: Law enforcement agencies and prosecutors can agree to split the revenue for their own use.[12] Some forfeiture critics lament that the bottom line . . . is the bottom line.

A generation ago in America, asset forfeiture was limited to wresting ill-gotten gains from violent criminals. Today, it has a distinctive "Alice in Wonderland" flavor, victimizing innocent citizens who've done nothing wrong. To some critics, 21st-century excesses are reminiscent of pre-Revolutionary America, when colonists chafed under the slights and indignities inflicted by King George III and Mother England—among them, "writs of assistance" that empowered government to invade homes and seize suspected contraband. Legal scholars have declared these writs "among the key grievances that triggered the American Revolution." [13]

Indeed, the Founders were intimately acquainted with confiscatory government. The Father of the United States Constitution, James Madison (who turned 85 the day the Republic of Texas adopted its Constitution and lived barely 100 days more, long enough to see Texas free) warned in Federalist 48 of the "encroaching nature" of government power.[14] Contemporary legal scholarship and journalism contend that modern civil-forfeiture law, which has spread with kudzu-like ferocity in recent years (amassing billions in seized profits along the way), seems less Madisonian than Orwellian.[15]

Modern government wields vast power, power that tests the boundaries of constitutional guarantees. Criminals in our legal system enjoy a presumption of innocence, requiring government to prove their guilt beyond a reasonable doubt. But property owners are actually treated

---

**11.** 388 S.W.3d 890, 894 (Tex.App.–Houston [14th Dist.] 2012).

**12.** Tex.Code Crim. Proc. art. 59.06(c).

**13.** Eric Blumenson & Eva Nilsen, *Policing for Profit: The Drug War's Hidden Economic Agenda,* 65 U. Chi. L.Rev. 35, 75 (1998).

**14.** The Federalist No. 48, at 332 (James Madison) (J. Cooke ed., 1961).

**15.** *See, e.g.,* Sarah Stillman, *Taken,* The New Yorker (Aug. 12, 2013); Louis S. Rulli, *On the Road to Civil Gideon,* 19 J.L. Pol'y 683 (2011); Todd Barnet, *Legal Fiction and Forfeiture: An Historical Analysis of the Civil Asset Forfeiture Reform Act,* 40 Duq. L.Rev. 77 (2001); Blumenson & Nilsen, *supra* note 13.

worse, presumed guilty and required to prove their innocence. Indeed, owners trying to retrieve their homes and other possessions bear a heavier burden than the government that confiscated them.

Until 1970, when Congress resurrected forfeiture as part of racketeering laws,[16] forfeiture outside the maritime context had been largely dormant since Colonial times—two notable exceptions being actions against criminal bootleggers during Prohibition[17] and the 1861 law allowing President Lincoln to seize the estates of Confederate soldiers.[18] But things changed radically in 1984, when Congress, as part of the war on drugs, began allowing government to seize property without first charging, let alone convicting, the owner—*and* letting law enforcement pocket the proceeds. States quickly got in on the act, passing their own forfeiture laws. And in the 30 years since then, virtually every crime-fighting measure enacted has widened the use of forfeiture, filling government coffers in the process.

Texas, like the federal government and other states, has dramatically expanded the use of civil forfeiture. But as asset forfeiture grows, so grows the risk of abuse—what some call "policing for profit." Across America, cash-strapped governments at all levels increasingly rely on civil forfeiture to boost revenue—to fund operations, buy new equipment, and so on. Government budgeteers relish multiple spigots, and money from confiscated property provides an irresistible profit incentive. But the intersection of power and profit is a troubling one.[19] When agency budgets grow dependent on asset forfeiture, not as an occasional windfall or supplement but as indispensable revenue to fund basic operations, constitutional liberties are unavoidably imperiled.[20] Unsurprisingly, a cottage industry has emerged to advise law enforcement how to boost their asset-seizing potential.

One wonders if our colonial ancestors, transported to 2014, would be astonished—watching government seize, then sell, the property of guiltless citizens who have not been charged with any crime, much less convicted of one. And unsurprisingly, civil forfeiture, once focused on the illicit goodies of rich drug dealers, now disproportionately ensnares those least capable of protecting themselves, poor Texans who usually capitulate without a fight because mounting a defense is too costly.

Funding government is important. Safeguarding the constitutional rights of Texans is more important. Fundamental rights should never be sacrificed with non-

---

**16.** 21 U.S.C. § 881.

**17.** National Prohibition Act, ch. 85, § 26, 41 Stat. 305, 315–16 (1919) (repealed 1933).

**18.** *See* Act of Aug. 6, 1861, ch. 60, 12 Stat. 319 (codified as amended at 50 U.S.C. § 212) (declaring that any property "used or employed, in aiding, abetting, or promoting [ ] insurrection or resistance to the laws, or any person or persons engaged therein; or if … owner or owners of any such property, shall knowingly use or employ, or consent to the use or employment of the same as aforesaid, all such property is hereby declared to be lawful subject of prize and capture wherever found.").

**19.** Ali also challenges on both state and federal constitutional grounds the direct-profit incentive in Texas forfeiture law.

**20.** Some states dampen the incentive to maximize forfeiture proceeds by limiting how such funds can be used. For example, Kansas law enforcement cannot use proceeds for "normal operating expenses," while their Texas counterparts have broad discretion in using proceeds for office-related purposes. *Compare* TEX.CODE OF CRIM. PROC. arts. 59.06(c)(1) & 59.06(c)(2)-(3) *with* KAN. STAT. ANN. § 60–4117(d)(3) (West, Westlaw through 2013 Reg. and Special Legis. Sess.).

chalance. The Texas Constitution places limits on capricious government abridgements, and does so on purpose. As Justice Brandeis warned in his prescient *Olmstead* dissent: "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent." [21]

In 2008 the Bureau of Alcohol, Tobacco, Firearms and Explosives sought bids for 2,000 Leatherman toolkits for its agents, to be inscribed with "Always Think Forfeiture," a play on the agency's familiar "ATF" initials.[22] The agency cancelled the order after some embarrassing press reports, but it underscored the government's alarming focus on enriching itself by seizing private property. To quote Chief Justice John Marshall, "This is too extravagant to be maintained." [23]

We have not addressed civil forfeiture since the Eisenhower Administration. Much has changed since our 1957 decision, most notably the vast expansion in 1989 of Texas forfeiture laws. In the quarter-century since, we have yet to revisit the protections due in such proceedings. Given the proliferation of modern forfeiture actions, accelerated by a stark profit incentive, I would reexamine the protections afforded property owners who are often ill-equipped to fight back. Depriving Texans of their liberty requires government to scale a high hurdle. Does depriving Texans of their homes or life savings merit less constitutional protection? Should government bear the burden of proving an owner's knowledge of his property's involvement in criminal activity? Does our Constitution have anything to say about a "presumed guilty" proceeding in which citizens are not arrested or tried, much less convicted, but are nonetheless punished, losing everything they've worked for? Does it matter, by the way, that government is given a handsome stake in forfeited property? Does the lure of revenues distort law-enforcement priorities, steering finite resources to reap the rewards of forfeitable assets, and thus blind officials to the risk of constitutional corrosion inflicted on the innocent? Are these all policy-laden judgments committed exclusively to the political branches, or does the Constitution set a baseline?

The Texas Constitution's protection of private property rights is unsubtle.[24] It is a building-block guarantee we have lauded as "fundamental, natural, inherent, [and] inalienable." [25] Our Constitution was written precisely to prevent *carte blanche* assertions of governmental power, to prevent police power from devolving into police state. The United States Supreme Court, for example, has recognized that forfeiture endangers rights and that the Eighth Amendment's "excessive fines" clause prohibits disproportionate civil forfeitures.[26] Given the ubiquity and muscularity of modern forfeiture practice, I believe the

**21.** *Olmstead v. United States*, 277 U.S. 438, 479, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting) (partially overruled by *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

**22.** Erika Bolstad, *ATF Drops Slogan That Offended Property Rights Advocates*, McClatchy DC, May 17, 2008, http://www.mcclatchydc.com/2008/07/17/37489/atf-drops-sloganthat-offended.html.

**23.** *Marbury v. Madison*, 5 U.S. 137, 179, 1 Cranch 137, 2 L.Ed. 60 (1803).

**24.** Tex. Const. art. I, § 19.

**25.** *Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532, 535 (Tex.2013) (citation omitted).

**26.** *Austin v. United States*, 509 U.S. 602, 604, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993).

judiciary should take a moment to reassess and ensure that 2014 practice comports with constitutional protections.

\* \* \*

The civil-forfeiture landscape has changed radically since we last examined this subject in 1957. Perhaps we would rule now as we ruled then, that Texas forfeiture law does not treat innocent property owners unconstitutionally. Even so, modern practice warrants modern study.[27]

Done right, forfeiture is a potent crime-fighting tool. But when a guiltless Texan is permanently stripped of his home and possessions, his property, however valuable, is not the most precious thing being surrendered. The forfeiture regime involves inherent imbalances, and judges must ensure that the constitutional scales aren't overly tipped in the government's favor. At minimum, I urge the Legislature, with senses heightened to what Edmund Burke called a "fierce spirit of liberty,"[28] to contemplate anew how Texas law treats its citizens.[29]

---

**27.** JUSTICE BOYD notes the United States Supreme Court's 5–4 decision in *Bennis v. Michigan*, 516 U.S. 442, 446, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996), which upheld the Michigan forfeiture statute against due-process and takings challenges under the United States Constitution. But in today's case, Ali isn't bringing a federal constitutional claim; he's bringing a *state* constitutional claim. To be sure, the U.S. Supreme Court has final-word authority on what the Federal Constitution means. Just as sure, *this* Court has ultimate authority to interpret the *Texas* Constitution, including whether it affords greater-than-federal protection to property owners. Federal courts are not the exclusive vindicators of individual rights; state courts are fully capable of protecting citizens' liberty—and not as a mere mirror of federal law. As Hamilton wrote in *Federalist No. 17,* aiming to reassure Anti–Federalists that state judiciaries would not be supplanted under the Federal Constitution, state courts are "the immediate and visible guardian of life and property." THE FEDERALIST No. 17, at 120 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Indeed, individual rights may find greater refuge in state courts, as many state constitutions have enshrined protections that extend beyond those in federal law. *See* Jeffrey S. Sutton, *What Does—And Does Not—Ail State Constitutions,* 59 U. KAN. L.REV. 687, 703 (2011). I agree wholeheartedly with a former justice of the Colorado Supreme Court: "For most Americans, Lady Justice lives in the halls of state courts." John Schwartz, *Critics Say Budget Cuts for Courts Risk Rights,* N.Y. TIMES, Nov. 27, 2011, at A18. The Texas Constitution boasts independent protective force, and this Court pronounces its reach and potency. For

a compelling discussion of the role of state judiciaries in our constitutional order, *see generally* Jennifer Walker Elrod, *Don't Mess With Texas Judges: In Praise of the State Judiciary,* 37 HARV. J.L. & PUB. POL'Y (forthcoming 2014).

Nor do I understand JUSTICE BOYD's mootness/standing point. Ali argues that the statute's burden-shifting scheme is unconstitutional. He refuses to assert innocent-owner status because he contends he shouldn't have to prove his innocence. Ali isn't required to rely on article 59.02(c) in order to attack its constitutionality. Plus, Ali is raising two separate constitutional arguments, targeting not only the "presumed guilty" feature of Texas forfeiture law, but also the direct-profit incentive that propels it, a feature enacted 32 years after *Richards.* Bottom line: Determining the constitutional protections due innocent Texans is a "Supreme Court case" by any measure. I have no idea if Ali would ultimately prevail. Maybe we would affirm *Richards,* or overrule it, or distinguish it. Mystery abounds. Such mysteries are why we should grant the case, hear oral argument, circulate opinion drafts, and engage in the sort of vigorous debate that results in meticulous Supreme Court decisions.

**28.** EDMUND BURKE, *Speech on Moving His Resolutions for Conciliation with the Colonies,* Mar. 22, 1775, in EDMUND BURKE: SELECTED WRITINGS AND SPEECHES 189 (Peter J. Stanlis ed., 2009).

**29.** In many states, for example, *government* bears the burden of proving the property owner knew his property was involved in criminal conduct. *See* OR. CONST. art. XV, § 3,

The issues in this case implicate solemn constitutional principles that deserve oral argument and further Supreme Court scrutiny. Because the Court decides otherwise, I respectfully dissent.

10(5)–(6) (West, Westlaw through Nov. 2012 General Election); CAL. HEALTH & SAFETY CODE § 11488.5(d)(1) (West, Westlaw through Ch. 3 of 2014 Reg. Sess.); COLO.REV.STAT. ANN. § 16–13–505(10)(a–b) (West, Westlaw through Ch. 1–3 and 5–7 of 2014 2d Reg. Sess.); FLA. STAT. ANN. § 932.703(6)(a) (West, Westlaw through 2013 1st Reg. Sess.); KAN. STAT. ANN. § 60–4106(a) (West, Westlaw through 2013 Reg. and Special Legis. Sess.).