# IN THE SUPREME COURT OF TEXAS

No. 12-0657

ASHISH PATEL, ANVERALI SATANI, NAZIRA MOMIN, MINAZ CHAMADIA, AND VIJAY LAKSHMI YOGI, PETITIONERS/CROSS-RESPONDENTS,

v.

TEXAS DEPARTMENT OF LICENSING AND REGULATION, ET AL., RESPONDENTS/CROSS-PETITIONERS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

JUSTICE WILLETT, joined by JUSTICE LEHRMANN and JUSTICE DEVINE, concurring.

*To understand the emotion which swelled my heart as I clasped this money, realizing that I had no master who could take it from me—that it was mine—that my hands were my own, and could earn more of the precious coin . . . . I was not only a freeman but a free-working man, and no master Hugh stood ready at the end of the week to seize my hard earnings.*[1]

Frederick Douglass's irrepressible joy at exercising his hard-won freedom captures just how fundamental—and transformative—economic liberty is. Self-ownership, the right to put your mind and body to productive enterprise, is not a mere luxury to be enjoyed at the sufferance of governmental grace, but is indispensable to human dignity and prosperity.[2]

Texans are doubly blessed, living under two constitutions sharing a singular purpose: to secure individual freedom, the essential condition of human flourishing. In today's age of

---

[1] FREDERICK DOUGLASS, THE LIFE AND TIMES OF FREDERICK DOUGLASS 259 (photo. reprint 2001) (1882).

[2] Honest work, Pope Francis recently reflected, means more than just earning our daily bread: "Where there is no work, there is no dignity." Pope Francis (Pontifex). June 11, 2014, 1:11 a.m. Tweet. *Available at* https://twitter.com/Pontifex/status/608909299704709120.

staggering civic illiteracy—when 35 percent of Americans cannot correctly name a single branch of government—it is unsurprising that people mistake majority rule as America's defining value.[3] But our federal and state charters are not, contrary to popular belief, about "democracy"—a word that appears in neither document, nor in the Declaration of Independence. Our enlightened 18th- and 19th-century Founders, both federal and state, aimed higher, upended things, and brilliantly divided power to enshrine a *promise* (liberty), not merely a *process* (democracy).

One of our constitutions (federal) is short, the other (state) is long—like *really* long—but both underscore liberty's primacy right away. The federal Constitution, in the first sentence of the Preamble, declares its mission to "secure the Blessings of Liberty."[4] The Texas Constitution likewise wastes no time, stating up front in the Bill of Rights its paramount aim to recognize and establish "the general, great and essential principles of liberty and free government."[5] The point is unsubtle and undeniable: Liberty is not *provided* by government; liberty *preexists* government. It is not a gift from the sovereign; it is our natural birthright. Fixed. Innate. Unalienable.

\* \* \*

*Democracy is two wolves and a lamb voting on what to have for lunch.*
*Liberty is a well-armed lamb contesting the vote.*[6]

This case concerns the timeless struggle between personal freedom and government power. Do Texans live under a presumption of liberty or a presumption of restraint? The Texas

---

[3] Press Release, Annenberg Pub. Policy Ctr. of the Univ. of Penn., Americans know surprisingly little about their government, survey finds (Sept. 17, 2014), *available at* http://cdn.annenbergpublicpolicycenter.org/wp-content/uploads/Civics-survey-press-release-09-17-2014-for-PR-Newswire.pdf (last visited June 25, 2015); *see also* ANNENBERG PUB. POLICY CTR., CIVICS SURVEY APPENDIX at 2 (2014) (providing the methodology for the study), http://www.annenbergpublicpolicycenter.org/wp-content/uploads/Civics-survey-appendix-09-17-14.pdf (last visited June 25, 2015).

[4] U.S. CONST. pmbl.

[5] TEX. CONST. art. I.

[6] Widely, if not assuredly, attributed to Benjamin Franklin.

Constitution confers power—but even more critically, it constrains power. What *are* the outer-boundary limits on government actions that trample Texans' constitutional right to earn an honest living for themselves and their families? Some observers liken judges to baseball umpires, calling legal balls and strikes, but when it comes to restrictive licensing laws, just how generous is the constitutional strike zone? Must courts rubber-stamp even the most nonsensical encroachments on occupational freedom? Are the most patently farcical and protectionist restrictions nigh unchallengeable, or are there, in fact, judicially enforceable limits?

This case raises constitutional eyebrows because it asks building-block questions about constitutional architecture—about how we as Texans govern ourselves and about the relationship of the citizen to the State. This case concerns far more than whether Ashish Patel can pluck unwanted hair with a strand of thread. This case is fundamentally about the American Dream and the unalienable human right to pursue happiness without curtsying to government on bended knee. It is about whether government can connive with rent-seeking factions to ration liberty unrestrained, and whether judges must submissively uphold even the most risible encroachments.

The U.S. Supreme Court has repeatedly declared that the right to pursue a lawful calling "free from unreasonable governmental interference" is guaranteed under the federal Constitution,[7] and is "objectively, deeply rooted in this Nation's history and tradition."[8] A pro-liberty presumption is also hardwired into the Texas Constitution, which declares no citizen shall be "*deprived* of life, liberty, property, [or] privileges or immunities"[9]—phrasing that indicates citizens already possess these freedoms, and government cannot take them "except by the due

---

[7] *Greene v. McElroy*, 360 U.S. 474, 492 (1959).

[8] *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997); s*ee also* 1 WILLIAM BLACKSTONE, COMMENTARIES *427 ("At common law every man might use what trade he pleased . . . .").

[9] TEX. CONST. art. I, § 19 (emphasis added).

course of the law of the land."[10] Texans are thus presumptively free, and government must justify its deprivations. So just how nonsensically can government stifle your constitutional right to put your know-how and gumption to use in a gainful trade?

I recognize the potential benefits of licensing: protecting the public and preventing charlatanism. I also recognize the proven benefits of constitutional constraints: protecting the public and preventing collectivism. Invalidating irrational laws does not beckon a Dickensian world of run-amok frauds and pretenders. The Court's view is simple, and simply stated: Laws that impinge your constitutionally protected right to earn an honest living must not be preposterous.

By contrast, the dissents see government power in the economic realm as infinitely elastic, and thus limited government as entirely fictive, troubling since economic freedom is no less vulnerable to majoritarian oppression than, say, religious freedom—perhaps more so. Exalting the reflexive deference championed by Progressive theorists like Justice Oliver Wendell Holmes, Jr., the dissents would seemingly uphold even the most facially protectionist actions. Stranger still, the principal dissent, while conceding that our state and federal Constitutions protect economic liberty, quotes liberally from Justice Holmes, who rejected that the Fourteenth Amendment does any such thing.[11]

---

[10] *Id.*

[11] The principal dissent dramatically—and predictably—accuses the Court of seeking to unleash the "*Lochner* monster*," trying to resurrect *Lochner v. New York*, 198 U.S. 45 (1905), in which the U.S. Supreme Court invalidated on federal "liberty of contract" grounds a state maximum-hours law for bakery workers. Post, at 12. (Hecht, C.J., dissenting). The *Lochner* bogeyman is a mirage but a ready broadside aimed at those who apply rational basis rationally. As one constitutional law scholar noted a generation ago, "'*Lochnerizing*' has become so much an epithet that the very use of the label may obscure attempts at understanding." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 435 (1st ed. 1978).
     I doubt the 3-0 panel of the U.S. Court of Appeals for the Fifth Circuit and Judge Sparks of the Western District of Texas believed they were unleashing any monsters, or, scarier still, *legislating from the bench*!—when they recently struck down state economic regulations on rational-basis grounds. *See St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir.), *cert. denied*, 134 S. Ct. 423 (2013) (invalidating the Louisiana "casket cartel"); *Brantley v. Kuntz*, No. A-13-CA-872-SS, 2015 WL 75244 (W.D. Tex. Jan. 5, 2015) (invalidating Texas barber-school regulations as applied to African hair braiding). Indeed, the Fifth Circuit in the casket cartel case dismissed the tired *Lochner* charge head-on, denying that the "ghost of *Lochner* [was] lurking about." *St. Joseph Abbey*, 712 F.3d at 227.

In any event, as Justice Holmes cruelly proved, dogmatic majoritarianism can exact a ruthless price. In *Buck v. Bell*, the U.S. Supreme Court considered whether Carrie Buck, a Virginia teenager raped and impregnated by her foster parents' nephew, could be forcibly sterilized on grounds that she was "feeble minded."[12] Speaking through Justice Holmes, the Court credulously accepted at face value the government's assertion that public welfare was a good-enough reason to forbid the "manifestly unfit from continuing their kind."[13] Compulsory sterilization was preferable to waiting to "execute degenerate offspring for crime, or to let them starve for their imbecility."[14] Nothing—not even coercive eugenics—trumped judicial submissiveness to whatever the majority decreed. Justice Holmes was unyielding, thundering one of the most heartless, ignominious lines in Supreme Court history: "Three generations of imbeciles are enough."[15]

Justice Holmes later boasted to a friend that "[it] gave me pleasure, establishing the constitutionality of a law permitting the sterilization of imbeciles."[16] Unquestioning deference necessarily meant civil liberties were trampled, but Justice Holmes's pro-statism minced no words: "a law should be called good if it reflects the will of the dominant forces of the community even

---

[12] 274 U.S. 200, 205 (1927).

[13] *Id.* at 207.

[14] *Id.*

[15] *Id.*

[16] Letter from Oliver Wendell Holmes, Jr. to Lewis Einstein (May 19, 1927), *in* THE HOLMES-EINSTEIN LETTERS: CORRESPONDENCE OF MR. JUSTICE HOLMES AND LEWIS EINSTEIN 1903–1935 267 (James Bishop Peabody, ed., 1964).

if it will take us to hell."[17] In fact, said Justice Holmes, "if my fellow citizens want to go to Hell I will help them. It's my job."[18]

Like the Court, I favor a less hard-hearted and more liberty-minded view for Texas, one that sees the judiciary as James Madison did when he introduced the Bill of Rights, as an "impenetrable bulwark" against imperious government.[19] The Texas Constitution enshrines structural principles meant to advance individual freedom; they are not there for mere show. Our Framers opted for constitutional—that is, *limited*—government, meaning majorities don't possess an untrammeled right to trammel. The State would have us wield a rubber stamp rather than a gavel, but a written constitution is mere meringue if courts rotely exalt majoritarianism over constitutionalism, and thus forsake what Chief Justice Marshall called their "painful duty"—"to say, that such an act was not the law of the land."[20]

To be sure, the Capitol, not this Court, is the center of policymaking gravity, and judges are lousy second-guessers of the other branches' economic judgments. Lawmakers' policy-setting power is unrivaled—but it is not unlimited. Preeminence does not equal omnipotence. Politicians decide if laws pass, but courts decide if those laws pass muster. Cases stretching back centuries treat economic liberty as constitutionally protected—we crossed that Rubicon long ago—and there is a fateful difference between active judges who defend rights and activist judges who concoct

---

[17] KEN I. KERSCH, CONSTRUCTING CIVIL LIBERTIES: DISCONTINUITIES IN THE DEVELOPMENT OF AMERICAN CONSTITUTIONAL LAW 151 (2004).

[18] Letter from Oliver Wendell Holmes, Jr. to Harold Laski (Mar. 4, 1920), *in* 1 HOLMES-LASKI LETTERS: THE CORRESPONDENCE OF MR. JUSTICE HOLMES AND HAROLD J. LASKI 1916–1935 249 (Mark DeWolfe Howe ed., 1953). Holmesian deference was praised by turn-of-the-century Progressives who craved a pervasive regulatory state, and got it via the New Deal-era U.S. Supreme Court.

[19] *See* 1 ANNALS OF CONG. 439 (1789) (Joseph Gales ed., 1843).

[20] *McCulloch v. Maryland*, 17 U.S. 316, 423 (1819).

rights. If judicial review means *anything*, it is that judicial restraint does not allow *everything*. The rational-basis bar may be low, but it is not subterranean.

I support the Court's "Don't Thread on Me" approach: Threaders with no license are less menacing than government with unlimited license.

I.

This case lays bare a spirited debate raging in legal circles, one that conjures legal buzzwords and pejoratives galore: activism vs. restraint, deference vs. dereliction, adjudication vs. abdication. The rhetoric at times seems overheated, but the temperature reflects the stakes. It concerns the most elemental—if not elementary—question of American jurisprudence: the proper role of the judiciary under the Constitution.

Judicial duty requires courts to act judicially by adjudicating, not politically by legislating. So when *is* it proper for a court to strike down legislative or executive action as unconstitutional? There are people of goodwill on both sides, and as this case demonstrates, it seems a legal Rorschach test, where one person's "judicial engagement" is another person's "judicial usurpation."[21]

There are competing visions, to put it mildly, of the role judges should play in policing the other branches, particularly when reviewing economic regulations. On one side is the Progressive left, joined by some conservatives, who favor absolute judicial deference to majority rule. Judge Robert Bork falls into this camp. A conservative luminary, Bork is heir to a Progressive luminary, Justice Holmes, who also espoused judicial minimalism. Both men believed the foremost principle

---

[21] When it comes to the "judicial activism" label, some observers throw up their hands entirely and insist it all turns on whose ox is gored. Justice Kennedy responds to charges of judicial activism this way: "An activist court is a court that makes a decision you don't like." Hon. Anthony Kennedy, Address at Forum Club of the Palm Beaches, Florida (May 14, 2010), *available at* http://www.c-span.org/video/?293521-1/justice-kennedy-remarks-supreme-court.

of American government was not individual liberty but majoritarianism.[22] As Judge Bork put it, "majorities are entitled to rule, if they wish, simply because they are majorities."[23]

The other side advocates "judicial engagement" whereby courts meaningfully enforce constitutional boundaries, lest judicial restraint become judicial surrender.[24] The pro-engagement camp argues the judiciary should be less protective of Leviathan government and more protective of individual freedom. Government exists, they contend, to secure pre-existing rights, as the Declaration makes clear in its first two paragraphs.[25] Thus, when it comes to judicial review of laws burdening economic freedoms, courts should engage forthrightly, and not put a heavy, pro-government thumb on the scale.

This much is clear: Spirited debates over judicial review have roiled America since the Founding, from *Marbury v. Madison*,[26] to *Worcester v. Georgia*[27] (against which President Jackson bellowed, "John Marshall has made his decision—now let him enforce it."[28]), to the late 19th and early 20th centuries, when Progressives opposed judicial enforcement of economic

---

[22] Judge Bork believed legislative majorities should wield near-absolute power, not just with economic policy as favored by turn-of-the-century Progressives, but across the board, including the unenumerated rights enshrined during the so-called "rights revolution" of the mid-20th century.

[23] ROBERT H. BORK, THE TEMPTING OF AMERICA 139 (1990).

[24] TIMOTHY SANDEFUR, THE RIGHT TO EARN A LIVING—ECONOMIC FREEDOM AND THE LAW (2010) (tracing the history of the right to earn a living as it was understood by the Founders, through the Civil War Amendments, the Progressive era, and current controversies over restrictive licensure laws); DAMON ROOT, OVERRULED—THE LONG WAR FOR CONTROL OF THE U.S. SUPREME COURT (2014) (chronicling the conflicting visions of judicial review and the degree to which courts should intervene to protect individual rights against government encroachment).

[25] *See* THE DECLARATION OF INDEPENDENCE para. 1–2 (U.S. 1776).

[26] 5 U.S. 137 (1803).

[27] 31 U.S. 515 (1832).

[28] HORACE H. HAGAN, EIGHT GREAT AMERICAN LAWYERS 79 (Fred B. Rothman & Co. 1987) (1923).

liberties, all the way to present-day battles over the Patient Protection and Affordable Care Act.[29] In the 1920s and 1930s, liberals began backing judicial protection of *non*economic rights, while resisting similar protection for property rights and other economic freedoms. The Progressives' preference for judicial nonintervention was later embraced by post-New Deal conservatives like Judge Bork. The judicial-review debate, both raucous and reasoned, is particularly pitched today within the broader conservative legal movement. A prominent fault line has opened on the right between traditional conservatives who champion majoritarianism and more liberty-minded theorists who believe robust judicial protection of economic rights is indispensable to limited government.[30]

When it comes to regulating the economy, Holmesian deference still dominates, as seen in the Supreme Court's landmark 2012 decision upholding the constitutionality of the Affordable Care Act.[31] During oral argument, the Solicitor General—echoing the dissenters in today's case—admonished that striking down President Obama's signature health-care law would amount to judicial activism that would "import *Lochner*-style substantive due process."[32] The Court, he implored, "has a solemn obligation to respect the judgments of the democratically accountable

---

[29] *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius* (NFIB), 132 S. Ct. 2566 (2012); *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014); *King v. Burwell*, 759 F.3d 358 (4th Cir. 2014), *affirmed*, __ S. Ct. __ (2015).

[30] Judge Bork favored both constitutional originalism and judicial deference to the democratic process, two ideals that sometimes clash, producing what Professor Ilya Somin calls the "Borkean dilemma." Ilya Somin, *The Borkean Dilemma: Robert Bork and the Tension Between Originalism and Democracy*, 80 U. OF CHI. L. REV. DIALOGUE 243 (2013). Originalism sometimes requires judicial invalidation of laws that contradict the Constitution's original meaning. But striking down laws contradicts Bork's preference for judicial minimalism. So while Judge Bork favored judicial deference, he also criticized as "judicial activism" certain New Deal-era Court decisions that expanded government control over the economy. BORK, *supra* note 23, at 56–57 (discussing *Wickard v. Filburn*, 317 U.S. 111 (1942), and lamenting that the Court's "new, permissive attitude toward congressional power was a manifestation of judicial activism").

[31] *NFIB*, 132 S. Ct. at 2566.

[32] Transcript of Oral Argument at 30, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012) (No. 11-398), *available at* http://www.archives.gov/research/court-records/supreme-court/11-398-tuesday.pdf.

9

branches of government."[33] A few days later, the President himself charged it would constitute raw judicial activism if the Court took the "unprecedented, extraordinary step of overturning a law that was passed by a strong majority of a democratically elected Congress,"[34] adding, "We have not seen a court overturn a law that was passed by Congress on an economic issue . . . for decades" —"We're going to the '30s, pre-New Deal."[35] We know how the story ended. The Court upheld the ACA on tax-power grounds, with Chief Justice Roberts famously stating, "It is not our job to protect the people from the consequences of their political choices."[36]

Today's case arises under the *Texas* Constitution, over which we have final interpretive authority, and nothing in its 60,000-plus words requires judges to turn a blind eye to transparent rent-seeking that bends government power to private gain, thus robbing people of their innate right—antecedent to government—to earn an honest living. Indeed, even if the Texas Due Course of Law Clause mirrored perfectly the federal Due Process Clause, that in no way binds Texas courts to cut-and-paste federal rational-basis jurisprudence that long post-dates enactment of our own constitutional provision, one more inclined to freedom.

---

[33] *Id*. at 110. The Chief Justice rejected the *Lochner* epithet and turned the tables, saying if the Court adopted the government's theory of the Commerce Clause, limited only to regulating insurance, it "would be going back to *Lochner*"—with courts selectively allowing Congress to use its commerce power to impose a health-insurance mandate but not an eat-your-broccoli mandate. *Id*. at 39.

[34] Jeff Mason, *Obama takes a shot at Supreme Court over healthcare*, REUTERS, Apr. 2, 2012, http://www.reuters.com/article/2012/04/02/us-obama-healthcare-idUSBRE8310WP20120402.

[35] Greg Jaffe, *Why does President Obama criticize the Supreme Court so much?*, WASH. POST, June 20, 2015, http://www.washingtonpost.com/politics/why-does-president-obama-criticize-the-supreme-court-so-much/2015/06/20/b41667b4-1518-11e5-9ddc-e3353542100c_story.html.

[36] *NFIB*, 132 S. Ct. at 2579. Two years earlier, however, in a political-speech case that involved a more searching standard of review, the Chief Justice declared, "there is a difference between judicial restraint and judicial abdication." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 375 (2010).

The principal dissent claims "the rational basis standard invokes objective reason as its measure," a contention difficult to take seriously.[37] Legal fictions abound in the law, but the federal "rational basis test" is something special; it is a misnomer, wrapped in an anomaly, inside a contradiction. Its measure often seems less objective reason than subjective rationalization. The dissent also says the fact that other states regulate threading provides "strong evidence that Texas' regulatory framework has a rational basis."[38] In my view, what happens in the Aloha State makes not the slightest constitutional difference in the Lone Star State. Unconstitutional encroachments reach across time zones and centuries. Just this week, in a case that took almost 80 years to bring, the U.S. Supreme Court struck down as unconstitutional a New Deal-era, raisin-confiscation regime that had spanned thirteen Presidents.[39]

The test adopted today bears a passing resemblance to "rational basis"-type wording, but this test is rational basis with bite, demanding actual *rationality*, scrutinizing the law's actual *basis*, and applying an actual *test*.[40] In my view, the principal dissent is unduly diffident, concluding the

---

[37] Post, at 18. (Hecht, C.J., dissenting).

[38] *Id.*

[39] *Horne v. Dep't of Agric.*, No. 14-275, 2015 WL 2473384 (U.S. June 22, 2015).

[40] While the dissenting Justices favor federal-style deference in economic matters, there is a notable distinction between the Texas Constitution and the federal Constitution as interpreted by federal courts. The Texas Constitution protects not just life, liberty, and property, but also "privileges or immunities," language the U.S. Supreme Court read out of the Fourteenth Amendment in the *Slaughter-House Cases*, 83 U.S. 36 (1872). *Slaughter-House* involved special-interest favoritism masquerading as a public-health measure, a law granting a private corporation an exclusive benefit at the expense of hundreds of local butchers. A few years earlier, when the Fourteenth Amendment was adopted to counter the Black Codes and other oppressive state laws, the amendment's author, antislavery Representative John Bingham, confirmed the liberties it protected included "the right to work in an honest calling and contribute by your toil in some sort to the support of your fellowmen and to be secure in the enjoyment of the fruits of your toil." CONG. GLOBE, 42D CONG., 1ST SESS., 86 app. (1871). The Fourteenth Amendment was a response to a host of post-Civil War actions to oppress former slaves. Section One, drafted by Representative Bingham, includes three clauses to safeguard individual rights: the Privileges or Immunities Clause, the Due Process Clause, and the Equal Protection Clause. So what *are* an American citizen's privileges and immunities? According to perhaps the leading Fourteenth Amendment history, anti-slavery abuses spurred Congress to fortify all Americans' civil rights against overbearing state governments, and to restore the Constitution's original purpose as "a document protecting liberty." MICHAEL KENT CURTIS, NO STATE SHALL ABRIDGE: THE FOURTEENTH AMENDMENT AND THE BILL OF RIGHTS 7 (1986). *See also* AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 166 (1998) (noting that the words "privileges," "immunities," "rights," and "freedoms" are "roughly synonymous"). Citing

11

threading rules, while "excessive"[41] and "obviously too much"[42] are not "clearly arbitrary."[43] If these rules are not arbitrary, then the definition of "arbitrary" is itself arbitrary. Without discussing (or even citing) recent federal cases striking down nonsensical licensing rules under the supine federal test,[44] the dissents sever "rational" from "rational basis," loading the dice—relentlessly—in government's favor.[45] Their test is tantamount to no test at all; at most it is pass/fail, and government never fails.[46]

---

Madison and other founders who used the words "rights," "liberties," "privileges," and "immunities" interchangeably, CURTIS, *supra* at 64–65, Curtis found similar usage in William Blackstone's influential 1765 *Commentaries on the Laws of England*, which described "privileges and immunities" as a blend of rights and liberties—although Curtis notes that Blackstone "divided the rights and liberties of Englishmen into those 'immunities' that were the residuum of natural liberties and those 'privileges' that society had provided in lieu of natural rights." CURTIS, *supra* at 64. Boiled down, privileges are state-given civil rights while immunities are God-given natural rights.

 When the Court in *Slaughter-House* upheld 5-4 the Louisiana monopoly law, it stressed that the Privileges or Immunities Clause only protected rights guaranteed by the United States and did not restrict state police power. What's the consensus view today of *Slaughter-House*? "Virtually no serious modern scholar—left, right, or center—thinks [that *Slaughter-House*] is a plausible reading of the [Fourteenth] Amendment." Akhil R. Amar, *Foreword: The Document and the Doctrine*, 114 HARV. L. REV. 26, 123 n.327 (2000).

 The important point for today's case is that *Slaughter-House*, while holding that the Fourteenth Amendment's Privileges or Immunities Clause offered no protection for individual rights against state officials, underscored that states themselves possess power to protect their citizens' privileges or immunities, including the right to pursue an honest living against illegitimate state intrusion. As the Court correctly notes, the drafters of the Texas Constitution were doubtless aware of this reservation of power to the states when they passed our own Privileges or Immunities Clause just two years later in 1875. One question lurking in today's case was whether this Court would do to *our* Privileges or Immunities Clause what the U.S. Supreme Court did to the federal clause—nullify it by judicial fiat.

[41] Post, at 11. (Hecht, C.J., dissenting).

[42] *Id*.

[43] *Id*. at 25.

[44] *See, e.g.*, *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir.), *cert. denied*, 134 S. Ct. 423 (2013); *Brantley v. Kuntz*, No. A-13-CA-872-SS, 2015 WL 75244 (W.D. Tex. Jan. 5, 2015).

[45] The principal dissent cites our 1957 decision in *State v. Richards*, 301 S.W.2d 597 (Tex. 1957), the last time we examined the constitutional protections due innocent property owners facing government seizure of their property. It merits mention that at least three members of this Court believe the modern asset-forfeiture regime "deserves attentive constitutional reconsideration, if not recalibration." *El-Ali v. State*, 428 S.W.3d 824, 826 (Willett, J., joined by Lehrmann, J., and Devine, J., dissenting to denial of pet.). And two others are open to reconsidering *Richards* in a future case. *Id*. at 824 (Boyd, J., concurring, joined by Guzman, J.).

[46] The dissents side with Justice Holmes's oft-quoted *Lochner* dissent, even though Justice Holmes rejected there what the dissents reaffirm here: The Constitution *does* protect economic liberty. Justice Holmes indeed seems to exalt majority rule above all—except when he doesn't. After he famously said, "I think that the word 'liberty,' in the Fourteenth Amendment, is perverted when it is held to prevent the natural outcome of a dominant opinion," he added this sweeping caveat: "unless it can be said that a rational and fair man necessarily would admit that the statute proposed would infringe fundamental principles as they have been understood by the traditions of our people and our

law." *Lochner v. New York*, 198 U.S. 45, 76 (1905) (Holmes, J., dissenting). This proviso, according to Judge Robert Bork, "spoiled it all" and prompted Bork to accuse Justice Holmes, a fellow judicial minimalist, of activism himself. BORK, *supra* note 23, at 45. ("So Holmes, after all, did accept substantive due process, he merely disagreed . . . about which principles were fundamental.").

A quick word on *Lochner*. While the vote was 5-4, eight of nine Justices (all but Justice Holmes) agreed that the Constitution protects economic liberty. And *Lochner* was not the first Supreme Court case to say so. That happened eight years earlier in *Allgeyer v. Louisiana*, which defined "liberty" in the Fourteenth Amendment to include the freedom "to pursue any livelihood or avocation; and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned." 165 U.S. 578, 589 (1897). As Justice Harlan acknowledged in the principal *Lochner* dissent, "there is a liberty of contract which cannot be violated even under the sanction of direct legislative enactment." 198 U.S. at 68 (Harlan, J., dissenting). Government may not "unduly interfere with the right of the citizen to enter into contracts" or to "earn his livelihood by any lawful calling, to pursue any livelihood or avocation." *Id*. at 65.

Historical note: This is the *first* Justice Harlan, The Great Dissenter, not his grandson who served on the Court in the mid-20th century. The first Justice Harlan, a strong proponent of natural rights, famously dissented in *Plessy v. Ferguson*, 163 U.S. 537, 552 (1896) (Harlan, J., dissenting), *overruled by Brown v. Bd. of Ed.*, 347 U.S. 483 (1954), and also in the *Civil Rights Cases*, 109 U.S. 3, 33 (1883) (Harlan, J., dissenting), that struck down federal anti-discrimination laws. Some scholars believe that Justice Harlan's dissent in *Lochner* had initially garnered a five-vote majority, but someone switched his vote.

While Justice Harlan's dissent, unlike Justice Holmes's dissent, believed economic liberty was constitutionally enshrined, he understood that states have a valid police-power interest in advancing public welfare. *Id*. ("liberty of contract is subject to such regulations as the state may reasonably prescribe for the common good and the well-being of society"). A law should be struck down only if there is "no real or substantial relation between the means employed by the state and the end sought to be accomplished by its legislation." *Id*. at 69. Justice Harlan would have upheld the New York maximum-hours law, but he stressed the presumption of constitutionality can be rebutted by evidence showing the restriction was arbitrary, unreasonable, or discriminatory. He simply found the government's health-and-safety justification plausible.

Importantly, there was no disagreement—none—between the *Lochner* majority and Justice Harlan's dissent over whether courts can legitimately scrutinize economic regulations. Nobody seriously disputes a state's omnibus power to safeguard its citizens' health and safety via economic regulation. Of course states have broad, inherent police power to enact general-welfare laws. Indeed, a few months after *Lochner*, the Court reaffirmed states' "firmly established" authority "to prescribe such regulations as may be reasonable, necessary and appropriate" to advance "the general comfort, health, and general prosperity of the state." *Cal. Reduction Co. v. Sanitary Reduction Workers*, 199 U.S. 306, 318 (1905). And just three years later, the Court upheld a maximum hours law for women. *Muller v. Oregon*, 208 U.S. 412 (1908). In fact, the *Lochner*-era Court upheld many more economic regulations than it overturned. Thomas Colby & Peter J. Smith, *The Return of Lochner*, 100 CORNELL L. REV. 527, 539–40 (2015). The disagreement in *Lochner* was over who bears the burden—the government to prove legitimacy, or the challenger to prove illegitimacy. Justice Harlan believed the latter: "when the validity of a statute is questioned, the burden of proof . . . is upon those who assert it to be unconstitutional." *Lochner*, 198 U.S. at 68 (citations omitted) (Harlan, J., dissenting). The Court today agrees, adopting an approach some might say tracks the principal Lochner dissent more than the *Lochner* majority.

The core question is one of constitutional limitation. Should judges blindly accept government's health-and-safety rationale, or instead probe more deeply to ensure the aim is not suppressing competition to benefit entrenched interests? A century and a half of pre-*Lochner* precedent allowed for judicial scrutiny of laws to ensure the laws actually intend to serve the public rather than a narrow faction. *See generally* HOWARD GILLMAN, THE CONSTITUTION BESIEGED: THE RISE AND DEMISE OF LOCHNER ERA POLICE POWERS JURISPRUDENCE (1993) (discussing the origins of *Lochner*-era jurisprudence). *Lochner* focused on a narrow issue: whether the maximum-hours law was truly intended to serve the general welfare or "other motives," namely to advantage the bakers' union and unionized bakeries over small, non-union bakeries, many of which employed disfavored immigrants.

Interestingly, some of the Texas commentary immediately following Lochner was quite favorable, including in the Dallas Morning News, which wrote "The right of contract is one of the most sacred rights of the freeman, and any interference with such privilege by Legislatures or courts is essentially dangerous and vicious." In Which the Right of Contract is Upheld, DALLAS MORNING NEWS, Apr. 20, 1905, at 6.

A wealth of contemporary legal scholarship is reexamining *Lochner*, its history and correctness as a matter of constitutional law, and its place within broader originalist thought, specifically judicial protection of unenumerated

II.

*You take my house when you do take the prop /*
*That doth sustain my house; you take my life /*
*When you do take the means whereby I live.*[47]

Government understandably wants to rid society of quacks, swindlers, and incompetents. And licensing is one of government's preferred tools, aiming to protect us from harm by credentialing certain occupations and activities. You can't practice medicine in Texas without satisfying the Board of Medical Examiners. You can't zoom down SH-130 outside Austin at 85 miles per hour (reportedly the highest speed limit in the Western Hemisphere) without a driver's license. Sensible rules undoubtedly boost our quality of life. And senseless rules undoubtedly weaken our quality of life. Governments at every level—national, state, and local—wield regulatory power, but not always with regulatory prudence, which critics say stymies innovation, raises consumer prices,[48] and impedes economic opportunity with little or no concomitant public benefit.[49] The academic literature has attained consensus: "a licensing restriction can only be

---

rights such as economic liberty. *See supra* note 24. Long story short: Legal orthodoxy about *Lochner* is evolving among many leading constitutional theorists. *See, e.g.*, Colby & Smith, *supra* at 527; DAVID E. BERNSTEIN, REHABILITATING LOCHNER—DEFENDING INDIVIDUAL RIGHTS AGAINST PROGRESSIVE REFORM (2011).

[47] WILLIAM SHAKESPEARE, THE MERCHANT OF VENICE, act 4 sc. 1.

[48] Licensing restrictions impact price "along four dimensions" according to one recent study:

First, professional licensing can act as a barrier to entry into the profession. Second, licensing can establish rules of practice, like advertising bans, that restrict competition. Third, state boards can suppress interstate competition by recognizing licenses only from their own state. Finally, a profession can prevent competition by broadening the definition of its practice, bringing more potential competitors under its licensing scheme. These 'scope-of-practice' limitations tend to oust low-cost competitors that operate at the fringes of an established profession.

Aaron Edlin & Rebecca Haw, *Cartels by Another Name: Should Licensed Occupations Face Antitrust Scrutiny?*, 162 U. PA. L. REV. 1093, 1112 (2014) (footnotes and citations omitted).

[49] Some government labor economists have concluded that "mandatory entry requirements of licensing cannot necessarily be relied upon to raise the quality of services." CAROLYN COX & SUSAN FOSTER, BUREAU OF ECON., FTC, THE COSTS AND BENEFITS OF OCCUPATIONAL REGULATION 21–27, 40 (1990), *available at* http://www.ramblemuse.com/articles/cox_foster.pdf.

justified where it leads to better quality professional services—and for many restrictions, proof of that enhanced quality is lacking."[50]

It merits repeating: Judicial duty does not include second-guessing everyday policy choices, however improvident. The question for judges is not whether a law is sensible but whether it is constitutional. Does state "police power"—the inherent authority to enact general-welfare legislation—*ever* go too far? Does a Texas Constitution inclined to limited government have *anything* to say about government irrationally subjugating the livelihoods of Texans?

A.

The Republic of Texas regulated just one profession: doctors.[51] In 1889, the State of Texas added one more: dentists.[52] Until the mid-20th century, occupational regulation in the Lone Star State was rare (aside from the post-Prohibition alcohol industry)[53] and was generally limited to professions with a clear public-safety impact: nurses, pharmacists, optometrists, engineers, etc.

---

[50] Edlin and Haw, *supra* note 48, at 1111–12 n.101 and accompanying text (citing numerous academic studies questioning the putative benefits of licensure).

[51] INTERIM REPORT TO THE 83RD TEX. LEG., 82D TEX. H. COMM. ON GOV'T EFFICIENCY & REFORM 57 (Jan. 2013), *available at* http://www.house.state.tx.us/_media/pdf/committees/reports/82interim/House-Committee-on-Goverement-Efficiency-and-Refrom-Interim-Report.pdf.

[52] *Id.*

[53] Traditionally, only the medical and legal professions were subject to occupational licensing. J.R.R., II, *Note, Due Process Limitations on Occupational Licensing*, 59 VA. L. REV. 1097, 1097 (1973). Later, as women, minorities and immigrants—those lacking political power—entered the labor market, incumbent interests lobbied politicians to erect barriers to thwart newcomers. For example, California called a constitutional convention in 1878 to combat what the Workingmen's Party called the "Chinese Menace," an influx of immigrant laborers from China. The result, cheaper labor costs and thus cheaper goods and services, was intolerable to incumbent interests, who imposed severe barriers to entry. One convention delegate confessed his goal forthrightly: "to hamper them in every way that human ingenuity could invent." SANDEFUR, *supra* note 24, at 146.

One such xenophobic law targeted Chinese launderers, who dominated San Francisco's laundry market. The U.S. Supreme Court said no. In *Yick Wo v. Hopkins*, the Court rejected efforts to persecute disfavored interests through arbitrary permitting laws. 118 U.S. 356 (1886) (striking down San Francisco's laundry-permitting ordinance, which, while couched in public-safety rhetoric, plainly aimed to eliminate competition from Chinese operators). The Court minced no words: "the very idea that one man may be compelled to hold his life, or the means of living . . . at the mere will of another seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself." *Id.* at 370.

Since World War II, however, the economy, both nationally and here in Texas, has undergone a profound shift. States now assert licensing authority over an ever-increasing range of occupations, particularly in the fast-growing service sector, which makes up "three-quarters of gross domestic product and most job growth in the U.S."[54] During the 1950s, fewer than five percent of American workers needed a state license.[55] By 1970 it had doubled to 10 percent, and by 2000 had doubled again.[56] In 2006, nearly one-third of U.S. workers needed government permission to do their job.[57]

This spike in licensing coincides with a decline in labor-union membership. "In fact, [occupational licensing] has eclipsed unionization as the dominant organizing force of the U.S. labor market."[58] Twice as many workers today are covered by licensing as by labor contracts.[59] Moreover, the pervasiveness of licensing seems unrelated to whether a state is labeled "red" or "blue" politically. Occupational regulation seems wholly disconnected from party-specific ideology. In addition, most economic regulations are enacted not by legislatures answerable to voters but by administrative bodies, often with scant oversight by elected officials.

---

[54] Stephanie Simon, *A License to Shampoo: Jobs Needing State Approval Rise*, WALL ST. J., Feb. 7, 2011, *available at* http://www.wsj.com/articles/SB10001424052748703445904576118030935929752.

[55] Morris M. Kleiner & Alan B. Krueger, *The Prevalence and Effects of Occupational Licensing*, BRITISH J. OF INDUSTRIAL RELATIONS 676, 678 (2010).

[56] *Id.* at 679.

[57] *Id.* at 678. *See also* MORRIS M. KLEINER, LICENSING OCCUPATIONS: ENSURING QUALITY OR RESTRICTING COMPETITION? 1 (W.E. Upjohn Institute for Employment Research, 2006); Morris M. Kleiner, *Occupational Licensing: Protecting the Public Interest or Protectionism?* 1 (W.E. Upjohn Institute for Employment Research, Policy Paper No. 2011-009, 2011).

[58] Edlin and Haw, *supra* note 48, at 1102. Today, licensing substitutes to some extent for unionization. *See* Suzanne Hoppough, *The New Unions*, FORBES. Feb. 25, 2008, *available at* http://www.forbes.com/part_forbes/2008/0225/100.html.

[59] Alan B. Krueger, *Do You Need a License to Earn a Living? You Might Be Surprised at the Answer*, N.Y. TIMES, Mar. 2, 2006, at C3.

The Lone Star State is not immune from licensure proliferation. An ever-growing number of Texans must convince government of their fitness to ply their trade, spurring the House Committee on Government Efficiency and Reform in 2013 to lament the kudzu-like spread of licensure: "The proliferation of occupational licensing by the State of Texas can be to the detriment of the very consumer the licensing is professing to protect."[60] Today the number of regulated occupations exceeds 500[61]—about 2.7 million individuals and businesses,[62] roughly one-third of the Texas workforce,[63] higher than the national average[64]—with many restrictions backed by heavy fines and even jail time. Importantly, these statistics reflect state-only regulations; local and federal rules raise the number of must-be-licensed workers higher still.[65]

---

[60] INTERIM REPORT, *supra* note 51, at 58.

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.* (citing KLEINER, LICENSING OCCUPATIONS, *supra* note 57, at 12).

[65] Kleiner & Krueger, *supra* note 55, at 678.

Unlike some states, Texas doesn't yet require florists,[66] interior designers,[67] horse massagers,[68] ferret breeders,[69] or fortune tellers[70] to get state approval (though the soothsayers would presumably see it coming). But the Lone Star State *does* require state approval to be a shampoo apprentice.[71] And to be an in-person auctioneer[72] (though not to be an *internet* auctioneer). And while you don't need a license to be a bingo caller in Texas, you must be listed on the Registry of Approved Bingo Workers in order to yell out numbers and letters.[73]

The "sum of good government," Thomas Jefferson said in his first inaugural, was one "which shall restrain men from injuring one another"—indisputably true—but "shall leave them

---

[66] Louisiana is the only state in the country that requires licenses for florists. *See* LA. REV. STAT. ANN. §§ 3:3804(A)(2), (3), (4), (C), (D), 3:3809 (2014). And until 2010, part of the licensing exam for aspiring florists included a flower-arranging demonstration . . . judged by their future competition. *See id.* § 3:3807(B)(2) (2008), *amended by* H.B. 1407, 2010 Leg., Reg. Sess. (La. 2010); s*ee also* Robert Travis Scott, *Florist bill delivered to Gov. Bobby Jindal's desk*, THE TIMES-PICAYUNE (June 16, 2010), *available at* http://www.nola.com/politics/index.ssf/2010/06/florists_bill_delivered_to_gov.html.

[67] *See, e.g.*, FLA. STAT. ANN. §§ 481.213 (West 2015); LA. REV. STAT. ANN. § 37:3176 (West 2014); NEV. REV. STAT. ANN. § 623.180(1) (West 2014); D.C. CODE § 47-2853.103 (2015).

[68] In Arizona and Nebraska, you can't be a horse masseuse without a license. *See* ARIZ. REV. STAT. ANN. § 32-2231(A)(4) (West 2015) (defining practice of veterinary medicine); 172 NEB. ADMIN. CODE § 182-004.02D (2015) (eligibility for licensure as an Animal Therapist in Massage Therapy); *see also* ANIMAL MASSAGE LAWS BY STATE, INT'L ASSOC. OF ANIMAL MASSAGE AND BODYWORK, http://www.iaamb.org/reference/state-laws-2013.html (last visited June 25, 2015).

[69] *See, e.g.*, MASS. GEN. LAWS ANN. ch. 131 § 77(2) (West 2015) ("[N]o person shall possess a ferret for breeding purposes without obtaining a license from the director. . . .").

[70] *See id.* ch. 140 § 185I(2) ("No person shall tell fortunes for money unless a license therefor has been issued by the local licensing authority.").

[71] TEX. OCC. CODE § 1602.267. In Tennessee, a shampoo license has a 300 hour instructional requirement. *See* Shampoo Technician, TN. DEP'T OF COMM. & INS. (last visited June 25, 2015), https://www.tn.gov/commerce/article/cosmo-shampoo-technician. Alabama also requires a license to practice as a "shampoo assistant." *See* ALA. CODE § 34-7b-1(21) (2014). *See also* Simon, *supra* note 54 (surveying trade regulations in several states, including shampooing regulations in Texas and barber regulations in California).

[72] TEX. OCC. CODE § 1802.051(a).

[73] 16 TEX. ADMIN. CODE § 402.402(b).

otherwise free to regulate their own pursuits of industry and improvements."[74] Without question, many licensure rules are justified by legitimate public health and safety concerns. And isolating the point at which a rule becomes unconstitutionally "irrational" eludes mathematical precision. But it is no more imprecise as when judges ascertain under the Constitution when a search is "unreasonable"[75] or bail "excessive"[76] or cause "probable"[77] or punishment "cruel and unusual."[78] Degree of difficulty aside, judges exist to be judgmental, hence the title.

The Texas Constitution has something to say when barriers to occupational freedom are absurd or have less to do with fencing out incompetents than with fencing in incumbents. As Nobel economist Milton Friedman observed, "the *justification*" for licensing is always to protect the public, but "the *reason*" for licensing is shown by observing who pushes for it—usually those representing not consumers but vested, already-licensed practitioners.[79] In other words, government's coercive power is often wielded to quash newcomers. As two federal appellate judges provocatively put it, "The practical effect of rational basis review of economic regulation is the absence of any check on the group interests that all too often control the democratic process. It allows the legislature free reign to subjugate the common good and individual liberty to the electoral calculus of politicians, the whims of majorities, or the self-interest of factions."[80]

---

[74] President Thomas Jefferson, First Inaugural Address (Mar. 4, 1801), *in* 8 THE WRITINGS OF THOMAS JEFFERSON 3–4 (Henry A. Washington ed., 1854).

[75] U.S. CONST. amend. IV.

[76] *Id*. amend. VIII.

[77] *Id*. amend. IV.

[78] *Id*. amend. VIII.

[79] MILTON FRIEDMAN & ROSE FRIEDMAN, FREE TO CHOOSE 240 (1980) (emphasis in original).

[80] *Hettinga v. United States*, 677 F.3d 471, 482–83 (D.C. Cir. 2012) (Brown, J., joined by Sentelle, C.J. concurring).

Summarizing: "Rational basis review means property is at the mercy of the pillagers. The constitutional guarantee of liberty deserves more respect—a lot more."[81]

Indeed, some fret that the focus of occupational regulation has morphed from protecting the public from unqualified providers to protecting practitioners from unwanted competition. Courts are increasingly asking whether societal benefits are being subordinated to the financial benefits of those lucky enough to be licensed. The U.S. Court of Appeals for the Fifth Circuit recently buried the so-called "casket cartel" in Louisiana, siding 3-0 with a group of woodworking Benedictine monks who supported their monastery by selling handcrafted pine coffins. State-licensed funeral directors found the competition unwelcome, and the monks were threatened with a fine and jail time for breaching Louisiana law that said only state-licensed funeral directors could sell "funeral merchandise." In striking down the anticompetitive law, the Fifth Circuit explained: "The great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or to the context of its adoption nor does it require courts to accept nonsensical explanations for regulation."[82] While acknowledging that *Williamson v. Lee Optical*[83]—the Supreme Court's authoritative treatment of rational-basis scrutiny—dictates deference to state policymakers, the Fifth Circuit underscored that "*Williamson* insists upon a rational basis," adding, "a hypothetical rationale, even post hoc, cannot be fantasy" or impervious to "evidence of irrationality."[84]

---

[81] *Id*. at 483.

[82] *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir.), *cert. denied*, 134 S. Ct. 423 (2013).

[83] 348 U.S. 483 (1955).

[84] *Id*. at 223.

A similar casket-cartel law was invalidated in 2002 by the U.S. Court of Appeals for the Sixth Circuit, the first federal appellate court since the New Deal to invalidate an economic regulation for offending economic liberties secured by the Fourteenth Amendment.[85] The court found no sensible connection between the onerous licensing requirements and the law's alleged "health and safety" purpose. The court rejected the state's predictable cries of "*Lochner*ism" and said the alleged bases for the law came close to "striking us with 'the force of a five-week-old, unrefrigerated dead fish.'"[86] The Sixth Circuit concluded it was ludicrous to see the law as anything but "an attempt to prevent economic competition,"[87] and that "protecting a discrete interest group from economic competition is not a legitimate governmental purpose."[88] Granting special economic favors to preferred interests may be a *common* government purpose—"the favored

---

[85] *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002). The U.S. Supreme Court grounds economic liberty in the Fourteenth Amendment, but as discussed above, it does so within the judicially invented concept of "substantive due process" rather than within the textual Privileges or Immunities Clause of the Fourteenth Amendment. The Clause, drafted by the Committee on Reconstruction, was specifically enacted to relieve rigid constraints on economic liberty, including post-Civil War licensing systems that hamstrung the economic activities of freed slaves. *See generally* HAROLD M. HYMAN & WILLIAM M. WIECEK, EQUAL JUSTICE UNDER LAW 319 (1982). Constitutionalizing well-understood rights, including the economic rights protected by the Civil Rights Act of 1866—making freedom actually meaningful—was the overriding point. And these protected economic rights included the right to practice a chosen trade. Jeffrey Rosen, *Translating the Privileges or Immunities Clause*, 66 GEO. WASH. L. REV. 1241, 1250–51 (1998). As noted above, the Clause's abolitionist author explained that it was intended to safeguard "the liberty . . . to work in an honest calling and contribute by your toil in some sort to the support of yourself, to the support of your fellowmen, and to be secure in the enjoyment of the fruits of your toil." CONG. GLOBE, 42D CONG., 1ST SESS., 86 app. (1871). The Fourteenth Amendment's legislative record is replete with indications that "privileges or immunities" encompassed the right to earn a living free from unreasonable government intrusion. *Id*.

As explained above, the U.S. Supreme Court's nullification of the federal Privileges or Immunities Clause in *Slaughter-House* began the process of undermining the amendment's civil-rights protections for black Americans in the South. *See, e.g.*, *United States v. Cruikshank*, 92 U.S. 542 (1875); *Plessy v. Ferguson*, 163 U.S. 537 (1896) *overruled by Brown v. Bd. of Ed.*, 347 U.S. 483 (1954). *Slaughter-House* has been accused of "strangling the privileges or immunities clause in its crib." Akhil R. Amar, *The Bill of Rights and the Fourteenth Amendment*, 101 YALE L.J. 1193, 1259 (1992). Worse, it emboldened legislatures to enact notorious Jim Crow laws. Scholars across the political spectrum agree that *Slaughter-House* reflects a deeply flawed understanding of constitutional history.

[86] *Craigmiles*, 312 F.3d at 225 (quoting *United States v. Searan*, 259 F.3d 434, 447 (6th Cir. 2001)).

[87] *Id*.

[88] *Id*. at 224.

21

pastime of state and local governments," as the Tenth Circuit put it[89]—but common doesn't mean constitutional. Merely asserting—and accepting—"Because government says so" is incompatible with individual freedom. Courts need not be contortionists, ignoring obvious absurdities to contrive imaginary justifications for laws designed to favor politically connected citizens at the expense of others.

More and more, courts—even comedians[90]—are scrutinizing the entry barriers imposed by occupational regulations. Earlier this year, a federal district court in Austin rejected the state's attempt to force a teacher of African hair braiding to meet state barber-school regulations.[91] Isis Brantley was vexed as to why her Institute of Ancestral Braiding needed a 2,000-square foot facility, 10 barber chairs, and 5 sinks to teach people how to twist and braid hair.[92] The court examined means and ends and agreed the requirements were senseless.[93] Why require sinks, for example, when braiders don't wash hair, and state law allows braiders to use just hand sanitizer?[94] The court refused to accept blindly the state's purported justifications. It conducted an actual judicial inquiry and observed the state was trying to "shoehorn two unlike professions 'into a single, identical mold, by treating hair braiders—who perform a very distinct set of services—as

---

[89] *Powers v. Harris*, 379 F.3d 1208, 1221 (10th Cir. 2004).

[90] A few years ago, Jon Stewart's *The Daily Show* lampooned state efforts to regulate hair braiding. *See The Daily Show* (Comedy Central television broadcast June 3, 2004), *available at* http://thedailyshow.cc.com/videos/adygsa/the-braidy-bill.

[91] *See Brantley v. Kuntz*, No. A-13-CA-872-SS, 2015 WL 75244, *8 (W.D. Tex. Jan. 5, 2015) ("[T]he regulatory scheme . . . exclude[s] Plaintiffs from the market absent a rational connection. . . .").

[92] *See id.* at *2.

[93] *See id.* at *7.

[94] *See id.* at *6. *The Oregonian* recently profiled a hair braider in Oregon, where braiders must have a cosmetology license, who daily crosses the border into Washington, where braiders are exempt. Most of her clients cross the border, too. The options for customers are simple: pay the cartel price or find an illicit braider. *See* Anna Griffin, *Braiding African American Hair at center of overregulation battle in Oregon*, THE OREGONIAN (Aug. 11, 2012), http://www.oregonlive.com/politics/index.ssf/2012/08/braiding_african_american_hair.html.

if they were [barbers].'"[95] The court stressed "the logical disconnect inherent in the scheme which contemplates the existence of hair-braiding schools but makes it prohibitively difficult for a hair-braiding school to enter the market."[96] The court concluded the rules lacked any "rational relationship to any legitimate government interest"[97] and were thus unconstitutional under the Fourteenth Amendment.[98]

Tellingly, the state declined to appeal, saying it would instead launch "a comprehensive review of the barber and cosmetology statutes" and "work with [the] legislative oversight committees on proposals to remove unnecessary regulatory burdens for Texas businesses and entrepreneurs."[99] Legislative response was swift—and unanimous—and Governor Abbott 15 days ago signed House Bill 2717 to deregulate hair braiding.[100] But as with many matters (*e.g.*, public school finance), it took a judicial ruling on constitutionality to spark legislative action.

The U.S. Supreme Court itself recently examined how states regulate professions, scrutinizing whether licensing boards dominated by industry incumbents are rightly focused on weeding out scammers and inept practitioners or wrongly focused on weeding out newcomers.[101]

---

[95] *Brantley*, 2015 WL 75244, at *7 (quoting *Clayton v. Steinagel*, 885 F. Supp. 2d 1212, 1215 (D. Utah 2012)) (quoting *Clayton v. Steinagel*, 885 F. Supp. 2d 1212, 1215 (D. Utah 2012)).

[96] *Id.*

[97] *Id.* at *8.

[98] *Id.*

[99] Angela Morris, *Braider Wins Against State Barber Regulations*, TEXAS LAWYER, Jan. 19, 2015, *available at* http://www.texaslawyer.com/id=1202715320677/Braider-Wins-Against-State-Barber-Regulations.

[100] Act of May 22, 2015, 84th Leg., R.S., ch. 413, § 2, 2015 Tex. Sess. Law Serv. 2717 (to be codified at Tex. Occ. Code § 1601.003(2)(E)), *available at* http://www.capitol.state.tx.us/tlodocs/84R/billtext/pdf/HB02717F.pdf#navpanes=0.

[101] *See* Morris M. Kleiner, *Occupational Licensing*, 14 J. ECON. PERSPECTIVES 189, 191 (2000) (describing the composition of state licensing boards).

Earlier this year in *North Carolina State Board of Dental Examiners v. FTC*,[102] the High Court held that a state dental board controlled by "active market participants" could be sued under federal antitrust law for cracking down on non-dentists who were offering teeth-whitening treatments.[103] The decision brought a smile to licensure critics who had long argued that self-regulation invites self-dealing and that state licensing boards prone to regulatory capture deserved no immunity for Sherman Act[104] abuses. Ever since *Parker v. Brown* 80-plus years ago,[105] such boards were deemed outside the Act's ban on cartels because, unlike traditional cartels, they were sanctioned by the state.[106] No more. *Parker* no longer insulates regulated regulators regulating to anticompetitive effect. Licensing boards comprised of private competitors will face Sherman Act liability if they flex power to smother aspiring entrepreneurs.[107]

B.

As today's case shows, the Texas occupational licensure regime, predominantly impeding Texans of modest means, can seem a hodge-podge of disjointed, logic-defying irrationalities, where the burdens imposed seem almost farcical, forcing many lower-income Texans to face a choice: submit to illogical bureaucracy or operate an illegal business? Licensure absurdities

---

[102] 135 S. Ct. 1101 (2015).

[103] *Id*. at 1110.

[104] *See generally* 15 U.S.C. §§ 1–7 (2004).

[105] 317 U.S. 341 (1943). *See also Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (stating two standards for *Parker* state action immunity: (1) state articulation of its purpose to displace competition, and (2) active state supervision).

[106] *See Parker*, 317 U.S. at 351 ("The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state.").

[107] *See N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. at 1110–11 ("But while the Sherman Act confers immunity on the States' own anticompetitive policies out of respect for federalism, it does not always confer immunity where, as here, a State delegates control over a market to a non-sovereign actor. . . . For purposes of *Parker*, a nonsovereign actor is one whose conduct does not automatically qualify as that of the sovereign State itself.") (citation omitted).

become apparent when you compare the wildly disparate education/experience burdens visited on various professions. The disconnect between the strictness of some licensing rules and their alleged public-welfare rationale is patently bizarre:

> Emergency Medical Technicians. EMTs are entrusted with life-and-death decisions. But in Texas, entry-level EMTs need only 140 hours of training before rendering life-saving aid.[108] Contrast that with the radically more onerous education/experience requirements for barbers (300 hours),[109] massage therapists (500 hours),[110] manicurists (600 hours),[111] estheticians (750 hours),[112] and full-service cosmetologists (1,500 hours).[113]

> Backflow Prevention Assembly Testers. Of the number of states and the District of Columbia that require licenses for backflow prevention assembly testers, the Lone Star State is the only place where it takes more than two weeks of training/experience—*way* more. Fifty times more. Not two weeks but two *years*.[114]

State licensing impacts our lives from head to toe. Literally. Starting at the top, where does hair end and the beard begin? Texas law has been quite finicky on the matter, leading Texas barbers and cosmetologists to spend years splitting legal hairs and clogging Texas courts. Both of these state-licensed professionals may cut hair, but until 2013 only barbers, not cosmetologists, had state

---

[108] 25 TEX. ADMIN. CODE § 157.32(c)(2)(B).

[109] TEX. OCC. CODE § 1601.253(c)(2).

[110] *Id.* § 455.156(b)(1).

[111] *Id.* § 1601.257(b)(3).

[112] *Id.* § 1602.257(b)(3).

[113] *Id.* § 1602.254(b)(3). A Class A Barber who completes an additional 300 hours of instruction in cosmetology—a total of 600 hours of training—may also be eligible to become a full-service cosmetologist. *Id.* § 1602.254(c).

[114] *See* TEX. HEALTH & SAFETY CODE § 341.034(c); 30 TEX. ADMIN. CODE § 30.60. Although one can begin working as a backflow prevention assembly tester with only 40 hours of instruction in Texas, obtaining a license requires two years of work experience. *See, e.g.*, 30 TEX. ADMIN. CODE § 30.60(4)–(5). In contrast, other states do not require pre-licensure work experience in addition to knowledge-based examinations. *See* IDAHO ADMIN CODE ANN. § r.24.05.01.335 (2014) (requirements for a backflow assembly tester license); MINN. STAT. § 326B.42 (West 2015) (defining "backflow prevention tester" as an individual qualified by training prescribed by the Plumbing Board); MINN. DEP'T OF LABOR & INDUS., Minnesota backflow agreement 2013, ASSE INT'L Ltr. (Oct. 15, 2013) (determining the requirements for certification), *available at* http://www.dli.mn.gov/CCLD/PDF/pe_agree.pdf; MO. CODE REGS. Tit. 10, § 60-11.030 (2015) (providing for certification upon completion of a written exam); UTAH ADMIN. CODE r. 309-305-5 (2015) (providing for certification upon completion of written and practical examinations).

permission to wield a razor blade to shave *facial* hair. Before 2013, if you wanted your beard shaved, you had to visit a barber (probably a man) and not a cosmetologist (probably a woman).[115] And what *is* a "beard" anyway? Why, it's the facial hair below the "line of demarcation" as defined in the Administrative Code.[116] Even the Attorney General of Texas got all shook up wondering whether Elvis's famous sideburns "were hair which a cosmetologist might trim, or a partial beard which could be serviced only [by] a barber."[117]

At the other bodily extreme, what's the demarcation between the foot (which podiatrists can treat) and the ankle (which they can't)? These are high-stakes disputes, and sometimes the licensing bodies have jurisdictional spats with each other, usually over "scope of practice" issues. So where *does* the foot end and the ankle begin? In 2010, this Court ended a nearly ten-year legal battle between, in one corner, the Texas Medical Association and Texas Orthopedic Association, and in the other, the Texas State Board of Podiatric Medical Examiners and Texas Podiatric Medical Association.[118]

---

[115] Prior to the 1960s and 1970s, rigid state laws codified sexual stereotypes that distinguished male barbers and barbershops from female cosmetologists (or beauticians) and beauty parlors. Unisex hair salons became in vogue in the late 1960s through the 1970s as courts invalidated these state statutes under the equal protection clause of the Fourteenth Amendment.

Today, although there is hardly a distinction between most barber and cosmetology services, there is plenty of opportunity for overzealous regulators to tag unsuspecting shop owners with "gotcha" fines. *See, e.g.*, *Tex. Dep't of Licensing & Regulation v. Roosters MGC, LLC*, No. 03-09-00253-CV, 2010 WL 2354064 (Tex. App.—Austin June 10, 2010, no pet.) (discussing whether a cosmetologist's use of a safety razor to remove hair from a customer's neck or face violates state law controlling what services can be provided exclusively by barbers).

[116] 16 TEX. ADMIN. CODE §§ 82.10 (8), (23).

[117] Tex. Att'y Gen. Op. No. JC-0211 (2000) ("We think it likely that most observers would consider the sideburns worn by the late Elvis Presley at the time of his early success in 1956 as part of his hair. On the other hand, whether the muttonchops which adorned his face at the time of his death were hair which a cosmetologist might trim, or a partial beard which could be serviced only a barber, is a question which in the absence of any articulated standard might well present difficulties to a cosmetologist who wished to remain within his or her licensed practice.").

[118] *Tex. Orthopaedic Ass'n v. Tex. State Bd. of Podiatric Med. Exam'rs*, 254 S.W.3d 714 (Tex. App—Austin 2008, pet. denied) (invalidating the Texas State Board of Podiatric Medical Examiners rule defining the word "foot").

According to the academic literature, the real-world effects of steroidal regulation are everywhere: increased consumer cost; decreased consumer choice; increased practitioner income; decreased practitioner mobility[119]—plus shrunken economic prospects for lower income, would-be entrepreneurs.[120] Thomas Edison, with little formal schooling, likely could not be a licensed engineer today, nor could Frank Lloyd Wright be a licensed architect.[121]

## III.

*No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity.*[122]

Anyone acquainted with human nature understands, as Madison did, that when people, or branches of government, are free to judge their own actions, nothing is prohibited. The Court recognizes that Texans possess a basic liberty under Article I, Section 19 to earn a living. And to safeguard that guarantee, the Court adopts a test allergic to nonsensical government encroachment. I prefer authentic judicial scrutiny to a rubber-stamp exercise that stacks the legal deck in government's favor.

My views are simply stated:

---

[119] *See e.g.*, SANDEFUR, *supra* note 24, at 24.

[120] *Id.* (noting that monopoly laws and restrictive licensing schemes were "often used to give economic favors to politically influential lobbyists").

[121] One powerful way regulations handicap innovation is through sweeping, inflexible, one-size-fits-all measures that crowd out novel services. For example, in the recent teeth-whitening case at the U.S. Supreme Court, the state dental board defined dentistry broadly to include teeth whitening. *N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. 1101, 1120 (2015). In today's case, eyebrow threaders want to thread eyebrows—and *only* want to thread eyebrows—but Texas defines the regulated trade of cosmetology so broadly, and irrationally, that threaders must take pricey and time-consuming classes to learn, well, *nothing* about threading but *lots* about non-threading. These Texans aim to provide a single service, but the government—exercising maximum will but minimum judgment—shackles creativity and innovation by lumping threading in with licensed, full-fledged cosmetology and requiring people to spend untold hours and dollars learning wholly irrelevant cosmetology techniques. The result, disproportionately affecting the poor, is the so-called "Cadillac effect": would-be entrepreneurs squashed by exorbitant start-up costs, and would-be consumers forced to either (1) pay a higher-than-necessary price (a Cadillac) when all they want to buy is a discrete service at a lower price (a Kia), or (2) go without, or perhaps try to do it themselves.

[122] THE FEDERALIST No. 10, at 79 (James Madison) (Clinton Rossiter ed., 1961).

1.  <u>The economic-liberty test under Article I, Section 19 of the Texas Constitution is more searching than the minimalist test under the Fourteenth Amendment to the United States Constitution.</u>

Even under the lenient rational-basis test—"the most deferential of the standards of review"[123]—the would-be threaders should win this case. It is hard to imagine anything more irrational than forcing people to spend thousands of dollars and hundreds of hours on classes that teach everything they don't do but nothing they actually do. Not one of the 750 required hours of cosmetology covers eyebrow threading. Government-mandated barriers to employment should actually bear some meaningful relationship to reality.

It is instructive to consider the U.S. Supreme Court's first occupational licensing case, from 1889. In *Dent v. West Virginia*[124]—which has never been overruled and is still cited approvingly[125]—the Court upheld a physician-licensing regime, calling it a way to protect "the general welfare of [the] people" and "secure them against the consequences of ignorance and incapacity, as well as of deception and fraud."[126] But the Court cautioned that constitutional limits exist. Government is free to mandate requirements "appropriate to the calling or profession," but not those that "have no relation to such calling or profession."[127] Why? Because that would "deprive one of his right to pursue a lawful vocation."[128] Restrictions must have a reasonable connection to the person's fitness or capacity. That explains the High Court's 1957 ruling in

---

[123] BLACK'S LAW DICTIONARY 1453 (10th ed. 2009).

[124] 129 U.S. 114 (1889).

[125] *See, e.g.*, *Conn v. Gabbert*, 526 U.S. 286, 292 (1999) (citing *Dent* with approval but declining to extend).

[126] *Dent*, 129 U.S. at 122.

[127] *Id.*

[128] *Id.*

*Schware v. Board of Bar Examiners*,[129] the *only* time the Court has struck down a licensing restriction under rational-basis review. In *Schware*, the Court invalidated New Mexico's attempt to bar a Communist Party member from practicing law: "any qualification must have a rational connection with the applicant's fitness or capacity to practice."[130]

The federal rational-basis requirement debuted amid Depression-era upheaval in 1934, when the Court in *Nebbia v. New York*,[131] criminalizing the sale of milk below the government-approved price, held "a State is free to adopt whatever economic policy may reasonably be deemed to promote public welfare,"[132] so long as it is not "unreasonable or arbitrary."[133] *Nebbia* was a constitutional bombshell, and its abandonment of strong judicial protection for economic liberty presaged a vast expansion of government power. Twenty years later came the Court's authoritative guidance on Fourteenth Amendment review of economic regulation: *Williamson v. Lee Optical.*[134] In *Lee Optical*, the Court, while implicitly recognizing a liberty right to pursue one's chosen occupation, held that economic regulation—here, forbidding opticians from putting old lenses in new frames—would be upheld if the court could conjure out of thin air any hypothetical reason why lawmakers *might* have enacted the law.[135] Uncertainty has persisted for decades, partly because, as the Court acknowledges, "Our cases have not elaborated on the standards for

---

[129] 353 U.S. 232, 238–39 (1957) (holding that former communist ties are not sufficiently related to the practice of law to warrant disbarment).

[130] *Id*. at 239.

[131] 291 U.S. at 530 (1934).

[132] *Id*. at 537.

[133] *Id*. at 530.

[134] 348 U.S. 483 (1955).

[135] *Id*. at 487–89.

determining what constitutes a 'legitimate government interest.'"[136] Some federal circuits, including the Fifth, have held it is improper to regulate solely to insulate incumbent business from competition.[137] But with a few notable exceptions, like the recent "casket cartel"[138] and African hair-braiding cases,[139] rational-basis review under the Fourteenth Amendment is largely a judicial shrug.

Indeed, federal-style scrutiny is quite unscrutinizing, with many burdens acing the rational-basis test while flunking the straight-face test. As the U.S. Supreme Court held almost 80 years ago in *United States v. Carolene Products*,[140] government has no obligation to produce evidence to sustain the rationality of its action; rather, "the existence of facts supporting the legislative judgment is to be presumed."[141] Courts "never require a legislature to articulate its reasons for enacting a statute" and will uphold a law "if there is any reasonably conceivable state of facts that could provide a rational basis" for it.[142] Indeed, it is "entirely irrelevant" whether the purported justification for a burdensome law "actually motivated the legislature."[143] Challengers must negate

---

[136] *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834 (1987). Indeed, the label "rational basis" is misleading because the federal test doesn't require the law to actually make sense. Rather, it asks whether a lawmaker maybe, possibly, conceivably, plausibly, imaginably, hypothetically *might* have thought it was a good idea. It doesn't even matter if lawmakers actually *intended* to violate the Constitution. The law will be upheld so long as a court can conjure *any* legitimate public purpose for the law. One complication: The U.S. Supreme Court has yet to articulate with precision what constitutes a "legitimate" government interest. But how can one make sense of the "legitimate state interest" requirement unless and until the Court explains what purposes are and are not acceptable? Answering the question would necessarily require the Court to state straightforwardly that some things are illegitimate state interests.

[137] *See, e.g.*, *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002); *Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008); *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir.), *cert. denied*, 134 S. Ct. 423 (2013).

[138] *See St. Joseph Abbey*, 712 F.3d at 215.

[139] *Brantley v. Kuntz*, No. A-13-CA-872-SS, 2015 WL 75244 (W.D. Tex. Jan. 5, 2015).

[140] 304 U.S.152 (1938).

[141] *Id*. at 152.

[142] *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993).

[143] *Id*.

every conceivable basis that might support it,[144] and judges are exhorted to invent a colorable justification if the one articulated by the government falls short. All this explains why critics charge the test is less "rational basis" than "rationalize a basis."

The dissents would subordinate concrete scrutiny to conjectural scrutiny that grants a nigh-irrebuttable presumption of constitutionality. It is elastic review where any conceivable, theoretical, imaginary justification suffices. In my view, Texas judges should instead conduct a genuine search for truth—*as they do routinely in countless other constitutional areas*—asking "What is government actually up to?" When constitutional rights are imperiled, Texans deserve actual scrutiny of actual assertions with actual evidence.

- Should Texas courts reflexively accept disingenuous or smokescreen explanations for the government's actions? No.

- Is government allowed to prevail with purely illusory or pretextual justifications for a challenged law? No.

- Must citizens negate even purely hypothetical justifications for the government's infringement of liberty? No.

- Are Texas courts obliged to jettison their truth-seeking duty of neutrality and help government contrive post hoc justifications? No.

Texas judges should discern whether government is seeking a constitutionally valid end using constitutionally permissible means. And they should do so based on real-world facts and without helping government invent after-the-fact rationalizations. I believe the Texas Constitution requires an earnest search for truth, not the turn-a-blind-eye approach that prevails under the federal Constitution.[145]

---

[144] *Id*. at 314–15.

[145] As mentioned above, the Texas Constitution has its own "privileges or immunities"-like language, and while *Slaughter-House* nullified federal protection, the U.S. Supreme Court declared that states were proper guardians of the "privileges or immunities" of state citizenship, including the right to pursue a calling. *Slaughter-House Cases*, 83 U.S. 36, 77–78 (1873). Texas did exactly that in its 1875 Constitution, acting quickly on the Court's statement that

2. <u>The Texas Constitution narrows the difference in judicial protection given to "fundamental" rights (like speech or religion) and so-called "non-fundamental" rights (like the right to earn a living).</u>

The jurisprudential fact of the matter is that courts are more protective of some constitutional guarantees than others. One bedrock feature of 20th-century jurisprudence, starting with the U.S. Supreme Court's New Deal-era decisions, was to relegate economic rights to a more junior-varsity echelon of constitutional protection than "fundamental" rights. Nothing in the federal or Texas Constitutions requires treating certain rights as "fundamental" and devaluing others as "non-fundamental" and applying different levels of judicial scrutiny, but it is what it is: Economic liberty gets less constitutional protection than other constitutional rights.

This is not opinion but irrefutable, demonstrable fact. Ever since what is universally known as "the most famous footnote in constitutional law"[146]—footnote four in *Carolene Products* in 1938[147]—the U.S. Supreme Court has applied varying tiers of scrutiny to constitutional challenges. Simplified, the Court divides constitutional rights into two discrete categories: fundamental and non-fundamental. Upshot: Your favored First Amendment speech rights receive stronger judicial protection than your disfavored Fifth Amendment property rights. The fragmentation is less logical than rhetorical, and is anchored less in principle than in power. Under the post-New Deal picking and choosing, speech gets preferred status while economic liberty is treated as "a poor relation"[148]—despite the Due Process Clause's explicit inclusion of "property" (and given the High

protection of individuals' non-federal privileges and immunities was a state concern. As the Court notes, however, the plaintiffs did not raise a separate privileges or immunities challenge.

[146] *See, e.g.*, Felix Gilman, *The Famous Footnote Four: A History of the* Carolene Products *Footnote*, 465 S. TEX. L. REV. 163, 165 (2004).

[147] 304 U.S. 144, 152 n.4 (1938) (creating a dichotomy between laws that regulate economic affairs, which get deferential judicial review, and laws that curtail important personal liberties or that target "discrete and insular minorities," which get more searching judicial scrutiny).

[148] *Dolan v. City of Tigard*, 512 U.S. 374, 392 (1994).

Court's nullification of the Privilege or Immunities Clause in *Slaughter-House*). Speech rights get no-nonsense "strict scrutiny" to ensure government is behaving itself while property rights get servile, pro-government treatment.

For example, when courts decide an Establishment Clause challenge under the First Amendment, they normally defer to a State's asserted secular purpose. But such deference is not blind. Courts don't simply take government's word for it; they are careful to ensure that a "statement of such purpose be sincere and not a sham."[149] Same with gender classifications. The Court in 1996 struck down Virginia's exclusion of women from Virginia Military Institute, explaining that government's asserted justification must be "genuine," as opposed to one that's been "hypothesized or invented *post hoc* in response to litigation."[150]

Digital privacy under the Fourth Amendment is another constitutional area where the U.S. Supreme Court requires real-world evidence rather than putting a pro-government thumb on the scale. Recently, in the landmark case *Riley v. California*,[151] prosecutors, citing concerns for officer safety and preserving evidence, insisted they did not need a warrant before searching an arrested suspect's smartphone. The Court unanimously rejected the prosecutors' excuses, making clear that justifications for burdening constitutional rights must be concrete, non-imaginary concerns "based on actual experience."[152] The Court held there was no real and documented evidence that warrantless searches were necessary to protect officers.[153] As for evidence destruction, the Court

---

[149] *Edwards v. Aguillard*, 482 U.S. 578, 586–87 (1987).

[150] *Unites States v. Virginia*, 518 U.S. 515, 533 (1996).

[151] 134 S. Ct. 2473 (2014).

[152] *Id.* at 2485.

[153] *Id.* at 2494.

was likewise unmoved, noting again the absence of actual evidence to back the State's assertion, adding that in any event, law enforcement has "more targeted ways to address those concerns."[154]

Some constitutional rights fall somewhere in between, like "commercial speech," not because the Constitution draws that distinction but because judges do. Commercial speech—advertisements and other business-related speech—is a hybrid under U.S. Supreme Court precedent, involving speech rights (protected vigorously) and economic rights (protected not so vigorously).[155] Imagine a law that makes it illegal to advertise Axe Body Spray because lawmakers believe it endangers the public. This law plainly burdens speech, but it burdens *economic* speech, which receives less judicial protection than, say, political speech.[156] Nonetheless, commercial speech restrictions still get meaningful judicial review. Courts would examine three factors: (1) whether government has a "substantial interest" in burdening the speech; (2) whether the restriction actually furthers that interest; and (3) whether there are less restrictive ways to achieve the stated goal so that speech is restricted as little as necessary.[157] Government bears the burden of proof, and the law receives a serious judicial pat-down, including whether it was honestly driven by a desire to serve public interests or was merely a pretext to serve private interests. Now imagine a different law, one banning the *sale* of Axe Body Spray. With this law, the legal deck is shuffled differently, and a judge would apply a less-rigorous test because the law targets not commercial *speech* but commercial *activity*, a so-called *non*-fundamental right. Because this law focuses on

---

[154] *Id.* at 2487.

[155] The Court first recognized the right "to follow any lawful calling, business, or profession he may choose" in *Dent v. West Virginia*, 129 U.S. 114, 121 (1889). For 126 years the Court has reaffirmed that right, even though judicial protection of it has waned. See *supra* notes 124–29 and accompanying text.

[156] *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2672 (2011) ("Indeed the government's legitimate interest in protecting consumers from 'commercial harms' explains 'why commercial speech can be subject to greater governmental regulation than noncommercial speech.'") (citations omitted).

[157] *Id*. at 2672–84.

economic activity, government wouldn't have to prove its health claims, or show that less restrictive means were available, or convince a judge that the law's purported purpose was a pretext to mask its true purpose.[158]

But "economic" and "noneconomic" rights indisputably overlap. As the U.S. Supreme Court has recognized, freedom of speech would be meaningless if government banned bloggers from owning computers. Economic freedom is indispensable to enjoying other freedoms—for example, buying a Facebook ad to boost your political campaign. A decade (and three days) ago in *Kelo v. City of New London*,[159] the landmark takings case that prompted a massive national backlash,[160] Justice Thomas's dissent lamented the bias against economic rights this way: "Something has gone seriously awry with this Court's interpretation of the Constitution. Though citizens are safe from the government in their homes, the homes themselves are not."[161]

*Kelo* is indeed illustrative, as the rational-basis test applies in eminent-domain cases, too, notwithstanding the assurance in footnote four of *Carolene Products* that alleged violations of the Bill of Rights deserve heightened scrutiny. Even though the Fifth Amendment explicitly protects

---

[158] The constitutional double standard becomes perplexing in cases where fundamental and non-fundamental rights overlap. A few years ago, the Eleventh Circuit upheld the constitutionality of an Alabama law banning the commercial distribution of sex toys. *Williams v. Morgan*, 478 F.3d 1316 (11th Cir. 2007). The case involved the collision of sexual activity (deemed fundamental) and commercial activity (deemed non-fundamental). Plaintiffs aimed for strict scrutiny by framing the case in sexual-privacy terms because they knew if the case was treated as an economic-rights case, the ban would likely survive rational-basis review. The Eleventh Circuit applied rational-basis review and upheld the law, viewing the case as one about *accessing* sex toys and not about *using* sex toys. Result: Purchasing items for the bedroom can be regulated, but using them consensually cannot. The Fifth Circuit held the opposite way, saying a similar Texas ban violated the Due Process Clause in *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 740 (5th Cir. 2008).

[159] 545 U.S. 469 (2005) (upholding the power of government to condemn private property for economic-development purposes).

[160] In the wake of *Kelo*, 45 states enacted property-rights reform to curb eminent domain. *See* Ilya Somin, *The political and judicial reaction to* Kelo, WASH. POST, June 4, 2015, *available at* http://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/06/04/the-political-and-judicial-reaction-to-kelo/.

[161] *Kelo*, 545 U.S. at 518 (Thomas, J., dissenting).

property, the U.S. Supreme Court has supplanted the *Carolene Products* bifurcation with rational-basis deference in takings cases. The *Kelo* Court stressed its "longstanding policy of deference to legislative judgments,"[162] and its unwillingness to "second-guess"[163] the city's determination as to "what public needs justify the use of the takings power."[164] Justice O'Connor's scathing dissent forcefully accused her colleagues of shirking their constitutional duty.[165]

A few years later in *District of Columbia v. Heller*,[166] which struck down D.C.'s ban on handguns and operable long guns, the Court divided on what measure of deference was appropriate in the Second Amendment context. In dissent, Justice Stevens lauded New Deal-era Justice Frankfurter and accused the Court of aggressive activism, chastising, "adherence to a policy of judicial restraint would be far wiser than the bold decision announced today."[167]

I would not have Texas judges condone government's dreamed-up justifications (or dream up post hoc justifications themselves) for interfering with citizens' constitutional guarantees. As in other constitutional settings, we should be neutral arbiters, not bend-over-backwards advocates for the government. Texas judges weighing state constitutional challenges should scrutinize government's *actual* justifications for a law—what policymakers *really* had in mind at the time, not something they dreamed up after litigation erupted. And judges should not be obliged to concoct speculative or far-fetched rationalizations to save the government's case.

3. Texas courts need not turn a blind eye to the self-evident reasons why an increasing number of Texans need a government permission slip to work in their chosen field.

---

[162] *Id*. at 469.

[163] *Id*. at 488.

[164] *Id*. at 483.

[165] *Id*. at 494 (O'Connor, J., dissenting).

[166] 554 U.S. 570 (2008).

[167] *Id*. at 680 n.39 (Stevens, J., dissenting).

Today's decision recognizes another key contributor to the irrationalities afflicting occupational licensing: the hard-wired inclination to reduce competition. This metabolic impulse—Human Nature 101—has always existed.

English courts protected the right to earn a living since the early Seventeenth Century, long before the U.S. Constitution was adopted. In 1614, the Court of King's Bench invalidated a law that required an apprenticeship with the local guild before someone could become an upholsterer, dismissing the cries of licensed upholsterers who warned of inexpert practitioners. Lord Chief Justice Coke, Britain's highest judicial officer, was unpersuaded, holding "no skill" was required, "for [someone] may well learn this in seven hours."[168] Lord Coke wrote that Magna Carta (now 800 years old) and English common law safeguarded the right of "any man to use any trade thereby to maintain himself and his family."[169] He compared the proponents of barriers, invariably incumbent businesses, to someone rowing a boat: "they look one way and row another: they pretend public profit, intend private."[170] That is, they speak of public welfare (increasing competence) but seek private welfare (decreasing competition). Guilds in England wielded licensing to create "artificial scarcity," prompting English courts to declare the right to earn a living one of "nationalistic concern for increasing the wealth of the realm."[171] Lord Coke said legal redress, not licensing, was preferred for most occupations, explaining the "possibility that a

---

[168] *Allen v. Tooley*, (1613) 80 Eng. Rep. 1055 (K.B.) 1057; 2 Bulstrode 186, 189.

[169] *Id.* at 1055.

[170] R.H. COASE, *The Lighthouse in Economics* (1974), *in* THE FIRM, THE MARKET, AND THE LAW 187, 196 (1988) (quoting Chief Justice Sir Edward Coke) (spelling modernized).

[171] SANDEFUR, *supra* note 24, at 23.

practitioner might do a bad job was not a good excuse for restricting economic freedom, raising costs to consumers, and depriving entrepreneurs of economic opportunity."[172]

Adam Smith echoed Coke a century and a half later in *The Wealth of Nations*, calling efforts to thwart people from exercising their dexterity and industry as they wish "a plain violation of this most sacred property."[173] Economic freedom was indeed prized in the colonies, which lacked a guild system, but the right was extolled less as a national wealth creator and more as man's natural birthright. In 1775, Thomas Jefferson previewed a principle he would underscore in the Declaration—the right to pursue happiness[174]—lamenting British laws that "prohibit us from manufacturing, for our own use, the articles we raise on our own lands, with our own labour."[175] Like what? Colonists were forbidden from making iron tools. Why? To enrich British toolmakers. Colonists were forbidden from making their own hats from the fur of American animals. Why? To enrich British hatmakers. Adam Smith, who considered economic choice "the most sacred and inviolable of rights," likewise observed the tendency of trades to raise wages by reducing the supply of skilled craftsmen.[176]

---

[172] *Id.*

[173] ADAM SMITH, AN INQUIRY INTO THE NATURE AND CAUSES OF THE WEALTH OF NATIONS 122 (Edwin Cannon, ed., Random House 1937).

[174] Jefferson echoed phrasing from the Virginia Declaration of Rights, written by Jefferson's friend George Mason just one month before Jefferson's masterpiece was issued, who extolled "the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety." *See* Va. Declaration of Rights § 2 (1776), *in* 1 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 234–35 (1971).

[175] THOMAS JEFFERSON, *A Summary View of the Rights of British America* (1774), *in* THE JEFFERSONIAN ENCYCLOPEDIA 963, 964 (John P. Foley ed., Funk & Wagnalls Co. 1900).

[176] SMITH, *supra* note 173, at 121–22.

What is past is indeed prologue.[177] Fast forward almost 250 years, and a prized taxi medallion in New York City now costs $1.25 million, quadruple the price of just a decade ago.[178] But the unalienable right to pursue happiness is not merely the right to possess things or to participate in activities we enjoy; it necessarily includes the right to improve our lot in life through industry and ingenuity.

A raft of modern research by Nobel Prize-winning economist Gary Becker and various social scientists confirms that practitioners desire to stifle would-be competitors.[179] In 2013, the Texas House Committee on Government Efficiency and Reform found this anticompetitive impulse alive and well in Texas, where licensure affords "clear advantages to members of the licensed profession, such as reduced competition and increased earnings."[180] The Committee observed that stiffer occupational regulations rarely originate with consumer and consumer advocacy groups; rather, they are pushed by entrenched industry members to secure "less competition, improved job security, and greater profitability."[181] The Committee, recognizing the myriad harms of occupational overregulation—measured in damage to "job growth and consumer choice"[182]—and fearing that Texas was headed towards "more, large-scale occupational licensing programs,"[183] made this recommendation: "The Legislature should implement a process to review

---

[177] *See* WILLIAM SHAKESPEARE, THE TEMPEST act 2, sc. 1.

[178] Matt Flegenheimer, *$1 Medallions Stifling the Dreams of Cabdrivers*, N.Y. TIMES, Nov. 14, 2013, at A24.

[179] Gary S. Becker, *A Theory of Competition Among Pressure Groups for Political Influence*, Q. J. ECON., 371–400 (1983).

[180] INTERIM REPORT, *supra* note 51, at 59.

[181] *Id*.

[182] *Id*.

[183] *Id*. at 60.

proposals to regulate new occupations, as well as existing licensing programs, based on real and documented harm to the public."[184]

The Legislature responded by passing House Bill 86, which creates a mechanism to critically examine whether existing occupational regulations are still needed, and to phase out those deemed unnecessary. Specifically, the new law requires the Sunset Advisory Commission, in assessing "an agency that licenses an occupation or profession," to probe whether, and how, existing occupational regulations actually serve the public interest.[185] The new law also allows a legislator to submit to the Commission for review and analysis any proposed legislation that would create a new or significantly modify an existing occupational licensing program.[186]

Courts need not be oblivious to the iron political and economic truth that the regulatory environment is littered with rent-seeking by special-interest factions who crave the exclusive, state-protected right to pursue their careers. Again, smart regulations are indispensable, but

---

[184] *Id*. at 62.

[185] TEX. GOV'T CODE § 325.0115(b). The Commission is required to assess:

(1) whether the occupational licensing program:
   (A) serves a meaningful, defined public interest; and
   (B) provides the least restrictive form of regulation that will adequately protect the public interest;
(2) the extent to which the regulatory objective of the occupational licensing program may be achieved through market forces, private or industry certification and accreditation programs, or enforcement of other law;
(3) the extent to which licensing criteria, if applicable, ensure that applicants have occupational skill sets or competencies that correlate with a public interest and the impact that those criteria have on applicants, particularly those with moderate or low incomes, seeking to enter the occupation or profession; and
(4) the impact of the regulation, including the extent to which the program stimulates or restricts competition and affects consumer choice and the cost of services. *Id*. at § 325(b)(1)-(4).

[186] The new law authorizes the Commission's chair to deny such a request for review on the recommendation of the executive director. The bill requires the Commission to report its review findings to the Legislature before the start of the next legislative session. The bill also requires the Commission, in analyzing legislation proposing the creation of an occupational licensing program, to determine whether the unregulated practice of the occupation would be inconsistent with the public interest, whether the public can reasonably be expected to benefit from an assurance of initial and continuing professional skill sets or competencies, and whether the public can be more effectively protected by means other than state regulation. *Id*. § 325.023(c)(1)–(3).

nonsensical regulations inflict multiple burdens—on consumers (who pay more for goods and services, or try to do the work themselves),[187] on would-be entrepreneurs (who find market entry formidable, if not impossible), on lower-income workers (who can't break into entry-level trades), and on the wider public (who endure crimped economic growth while enjoying no tangible benefit whatsoever).[188]

## IV.

*In Europe, charters of liberty have been granted by power. America has set the example . . . of charters of power granted by liberty.*[189]

The Founders pledged their lives, fortunes, and sacred honors to birth a new type of nation—one with a radical design: three separate, co-equal, and competing branches. Three rival branches deriving power from three unrivaled words: "We the People." Both the Texas and federal Constitutions presume the branches will be structural adversaries—that legislators, for example, will jealously guard their lawmaking prerogative if the executive begins aggrandizing power. Indeed, inter-branch political competition is a precondition to advancing inter-firm economic competition—that is, the judicial branch asserting judicial power to ensure that the political branches don't arbitrarily insulate established practitioners from newcomers.

---

[187] HOWARD BAETJER, JR., FREE OUR MARKETS—A CITIZENS' GUIDE TO ESSENTIAL ECONOMICS 95–96 (2013).

[188] KLEINER, LICENSING OCCUPATIONS, *supra* note 57, at 53.

[189] James Madison, *Charters* (Jan. 19, 1792), *in* JAMES MADISON—WRITINGS 733, 736 (Jack N. Rakove ed., 1999). *See also* 1 JAMES WILSON, *Of the Study of the Law in the United States*, *in* THE WORKS OF JAMES WILSON: ASSOCIATE JUSTICE OF THE SUPREME COURT, AND PROFESSOR OF LAW IN THE COLLEGE OF PHILADELPHIA 1, 6–7 (James De Witt Andrews ed., Callaghan & Co. 1895) ("Without liberty, law loses its nature and its name, and becomes oppression. Without law, liberty also loses its nature and its name, and becomes licentiousness.").

Madison, lead architect of the U.S. Constitution, saw his bedrock constitutional mission as ensuring that America does not "convert a limited into an unlimited Govt."[190] Enlightenment philosopher Montesquieu likewise warned of power concentrated: "When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty."[191] Madison paid homage to "the celebrated Montesquieu" in Federalist 10, which gave voice to Madison's gravest worry: the risk of runaway majorities trampling individual liberty.[192] Madison turned 85 on the day delegates adopted the Constitution of the Republic of Texas. "He lived barely 100 days more, just long enough to see Texas free."[193] And just like Madison's handiwork, the *Texas* Constitution—then and today—exists to secure liberty.

## A.

As mentioned earlier, the term "judicial activism" is a legal Rorschach test. I oppose judicial activism, inventing rights not rooted in the law. But the opposite extreme, judicial passivism, is corrosive, too—judges who, while not activist, are not *active* in preserving the liberties, and the limits, our Framers actually enshrined. The Texas Constitution is irrefutably framed in proscription, imposing unsubtle and unmistakable limits on government power. It models the federal Constitution in a fundamental way: dividing government power so that each branch checks and balances the others. But as we recently observed, "the Texas Constitution takes Madison a step further by including, unlike the federal Constitution, an explicit Separation of

---

[190] James Madison, *Letter to Spencer Roane* (Sept. 2, 1819), *in* JAMES MADISON: WRITINGS, *supra* note 189, at 736.

[191] 1 CHARLES DE SECONDAT MONTESQUIEU, THE SPIRIT OF LAWS 181 (1st Amer. from the 5th London ed. 1802).

[192] THE FEDERALIST No. 51, at 298 (James Madison) (Clinton Rossiter ed., 1961) (citing Montesquieu for the proposition that the three branches of government, yet intertwined, do not violate the principle of separation of powers).

[193] *In re State Bd. for Educator Certification*, 452 S.W.3d 802, 808 n.38 (Tex. 2013).

Powers provision to curb overreaching and to spur rival branches to guard their prerogatives."[194] The Texas Constitution constrains government power in another distinctive way: It lacks a Necessary and Proper Clause, often invoked to expand Congress's powers beyond those specifically enumerated.[195] Moreover, as noted above, it contains a Privileges or Immunities Clause that, unlike the federal version, has never been judicially nullified.[196]

As judges, we have no business second-guessing *policy* choices, but when the Constitution is at stake, it is not impolite to say "no" to government. Liberties for "We the People" necessarily mean limits on "We the Government." That's the very reason constitutions are written: to stop government abuses, not to ratify them. Our supreme duty to our dual constitutions and to their shared purpose—to "secure the Blessings of Liberty"[197]—requires us to check constitutionally verboten actions, not rubber-stamp them under the banner of majoritarianism. For people to live their lives as they see fit, a government of limited powers must exercise that power not with force but with reason. And an independent judiciary must *judge* government actions, not merely rationalize them. Judicial restraint doesn't require courts to ignore the nonrestraint of the other branches, not when their actions imperil the constitutional liberties of people increasingly hamstrung in their enjoyment of "Life, Liberty and the pursuit of Happiness."[198]

---

[194] *Id*. at 808 n.39 (citing TEX. CONST. art. II, § 1).

[195] U.S. CONST. art. I, § 8, cl. 18.

[196] *See supra* notes 40, 86, and 145, and accompanying text.

[197] U.S. CONST. pmbl. *See also* TEX. CONST. art. I (declaring its utmost mission to safeguard "the general, great and essential principles of liberty and free government").

[198] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) (underscoring that governments are "instituted among Men" in order to "secure" our "unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness").

The power to "protect the public" is a heady and fearsome one.[199] Government is charged with promoting the general welfare, but it must always act within constitutional constraints. Our two constitutions exist to advance two purposes: individual liberty through limited government. Our federal and state Founders saw liberty as America's natural, foundational value, and our rights as too numerous to be exhaustively listed. Liberty both *justifies* government (to erect basic civic guardrails) and *limits* government (to minimize abridgements on human freedom). In other words, our dual constitutional charters exist not to *exalt* majority rule but to protect prepolitical rights that *limit* majority rule. Majoritarianism cannot be permitted to invert our bottom-line constitutional premise. The might of the majority, whatever the vote count, cannot trample individuals' rights recognized in both our federal and state Constitutions, not to mention in our nation's first law, the Declaration.[200]

B.

*Our State Constitution, like Madison's Federal handiwork, is infused with Newtonian genius: three rival branches locked in synchronous orbit by competing interests—ambition checking ambition.*[201]

Isaac Newton died in 1727, before James Madison, the Father of the U.S. Constitution, was even born, but our Founders, both state and federal, understood political physics: "power seized

---

[199] *See, supra* notes 12–18 (discussing *Buck v. Bell*, 274 U.S. 200 (1927), which upheld forcible sterilization of the "feeble-minded").

[200] Congress placed the Declaration of Independence at the outset—page 1, volume 1—of the United States Code, under this heading: "Organic Laws of the United States of America." Lincoln describes the Declaration of Independence as a lens through which just laws become clear—as the framework for interpreting the law—when he calls the Declaration an "apple of gold," and the Constitution the "picture of silver" framed around it. ABRAHAM LINCOLN, *Fragment on the Constitution and the Union* (Jan. 1861), *in* 4 THE COLLECTED WORKS OF ABRAHAM LINCOLN 169 (Roy P. Basler ed., 1953). The Constitution, indeed all laws, must not be considered independently of the ultimate purpose for which they are designed: not to unhinge democracy, but to secure liberty.

[201] *In re State Bd. for Educator Certification*, 452 S.W.3d 802, 808 (2014).

by one branch necessarily means power ceded by another."[202] Newton's Third Law of Motion, while a physical law, also operates as a political law. When one branch of government exerts a force, there occurs an equal and opposite counterforce. The Laws of Constitutional Motion require these rival branches to stay within their sphere, flexing competing forces so that power is neither seized nor ceded.

Our Framers understood that government was inclined to advance its own interests, even to the point of ham-fisted bullying, which is precisely why the Constitution was written—to keep *government* on a leash, not We the People. But individual liberty pays the price when our ingenious system of checks and balances sputters, including when the judiciary subordinates liberty to the congeries of group interests that dictate majoritarian outcomes. Daily and undeniably, there exist government incursions that siphon what Thomas Jefferson called our "due degree of liberty"[203]— "siphoning that often occurs subtly, with such drop-by-drop gentleness as to be imperceptible."[204]

Police power is undoubtedly an attribute of state sovereignty, but sovereignty ultimately resides in "the people of the State of Texas."[205] The Texas Constitution limits government encroachments, and does so on purpose. "Our Bill of Rights is not mere hortatory fluff; it is a

---

[202] *Id.*

[203] Letter from Thomas Jefferson to James Madison, Paris (1787), *in* THE JEFFERSONIAN ENCYCLOPEDIA: A COMPREHENSIVE COLLECTION OF THE VIEWS OF THOMAS JEFFERSON 277 (John P. Foley ed., 1900). *See also* Edmund Burke, *Speech on Moving His Resolutions for Conciliation with the Colonies*, Mar. 22, 1775, *in* EDMUND BURKE: SELECTED WRITINGS AND SPEECHES 147, 158 (Peter J. Stanlis ed., Doubleday & Co. 1968) (''In this character of the Americans a love of freedom is the predominating feature which marks and distinguishes the whole: and as an ardent is always a jealous affection, your colonies become suspicious, restive, and untractable, whenever they see the least attempt to wrest from them by force, or shuffle from them by chicane, what they think the only advantage worth living for. This fierce spirit of liberty is stronger in the English colonies, probably, than in any other people of the earth . . .'').

[204] *Robinson v. Crown Cork & Seal, Inc.*, 335 S.W.3d 126, 165 (Tex. 2010) (Willett, J., concurring). Or, as 18th-century philosopher David Hume cautioned, "It is seldom, that liberty of any kind is lost all at once." Rather, suppression "must steal in upon [people] by degrees, and must disguise itself in a thousand shapes, in order to be received." DAVID HUME, OF THE LIBERTY OF THE PRESS (1741), *in* David HUME: POLITICAL ESSAYS 3 n.4 (Knud Haakonssen ed., 1994).

[205] TEX. CONST. pmbl.

purposeful check on government power."[206] And everyday Texans, and the courts that serve them, must remain vigilant. Government will always insist it is acting for the public's greater good, but as Justice Brandeis warned in his now-celebrated *Olmstead* dissent: "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent."[207]

Before solving a problem, you must first define it. The Lone Star State boasts a spirit of daring and rugged independence, virtues essential to personal and economic dynamism, but bureaucratic headwinds imperil that vitality. Almost two centuries ago, around the time of Texas independence, Alexis de Tocqueville, a keen observer of early America, warned of "soft despotism" wrought by government that "covers the surface of society with a network of small complicated rules" that "even the most original and energetic characters cannot penetrate."[208] Tocqueville's warnings for 1835 America apply equally to 2015 Texas, where "administrative despotism," though doubtless well-meaning, inflicts a real-world toll on honest, hardworking Texans:

> The will of man is not shattered, but softened, bent, and guided; men are seldom forced by it to act, but they are constantly restrained from acting. Such a power does not destroy, but it prevents existence; it does not tyrannize, but it compresses, enervates, extinguishes, and stupefies a people, till each nation is reduced to nothing better than a flock of timid and industrious animals, of which government is the shepherd.[209]

Government's conception of its own power as limitless is hard-wired. But under the Texas Constitution, government may only pursue constitutionally permissible ends. Naked economic

---

[206] *Robinson*, 335 S.W.3d at 164 (Willett, J., concurring).

[207] *Olmstead v. United States*, 277 U.S. 438, 479 (1928) (Brandeis, J., dissenting), *overruled by Katz v. United States*, 389 U.S. 347 (1967).

[208] ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 319 (P. Bradley ed.1994).

[209] *Id*.

protectionism, strangling hopes and dreams with bureaucratic red tape, is not one of them. And such barriers, often stemming from interest-group politics, are often insurmountable for Texans on the lower rungs of the economic ladder (who unsurprisingly lack political power)—not to mention the harm inflicted on consumers deprived of the fruits of industrious entrepreneurs. Irrational licensing laws oppress hard-working Texans of modest means, men and women struggling to do what Texans of all generations have done: to better their families through honest enterprise.[210]

## V.

> [W]hile baseball may be the national pastime of the citizenry, dishing out special economic benefits to certain in-state industries remains the favored pastime of state and local governments.[211]

Governments are "instituted among Men" to "secure" preexisting, "unalienable Rights."[212] Our federal and Texas Constitutions are charters of liberty, not wellsprings of boundless government power. Madison adroitly divided political power because he prized a "We the People" system that extolled citizens over a monarchical system of rulers and subjects. The trick was to give government its requisite powers while structurally hemming in that power so that fallible men wouldn't become as despotic as the hereditary monarchs they had fled and fought.

Economic liberty is "deeply rooted in this Nation's history and tradition,"[213] and the right to engage in productive enterprise is as central to individual freedom as the right to worship as one chooses. Indeed, Madison declared that "protection" of citizens' "faculties of acquiring property"

---

[210] To the degree that "footnote four" of *Carolene Products* says "discrete and insular minorities" in the political arena deserve special judicial protection, it is tough to imagine a group more disadvantaged by the majoritarian political process than would-be entrepreneurs denied their calling by Byzantine, State-enforced barriers enacted at the behest of entrenched, politically powerful interests.

[211] *Powers v. Harris*, 379 F.3d 1208, 1221 (10th Cir. 2004).

[212] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

[213] *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997).

is the "first object of government,"[214] and admonished that a government whose "arbitrary restrictions" deny citizens "free use of their faculties, and free choice of their occupations" was "not a just government."[215] When it comes to occupational licensing—often less about protecting the public than about bestowing special privileges on political favorites—government power has expanded unchecked. But government doesn't get to determine the reach of its own power, something that subverts the original constitutional design of limited government. The Texas Constitution imposes limits, and imposes them intentionally.[216] Bottom line: Police power cannot go unpoliced.

I believe judicial passivity is incompatible with individual liberty and constitutionally limited government. Occupational freedom, the right to earn a living as one chooses, is a nontrivial constitutional right entitled to nontrivial judicial protection. People are owed liberty by virtue of their very humanity—"endowed by their Creator," as the Declaration affirms.[217] And while government has undeniable authority to regulate economic activities to protect the public against fraud and danger, freedom should be the general rule, and restraint the exception.

The Founders understood that a "limited Constitution" can be preserved "no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or

---

[214] THE FEDERALIST NO. 10, at 78 (James Madison) (Clinton Rossiter ed., 1961).

[215] MADISON, *Property* (Mar. 29, 1792), *in* JAMES MADISON: WRITINGS, *supra* note 189, at 516. The author of the Declaration agreed: "[E]very one has a natural right to choose that [vocation] which he thinks most likely to give him comfortable subsistence." THOMAS JEFFERSON, THOUGHTS ON LOTTERIES (1826), *in* THE JEFFERSONIAN ENCYCLOPEDIA 609 (John P. Foley ed., Funk & Wagnalls Co. 1900).

[216] As discussed above, *see supra* notes 194–96 and accompanying text, the Texas Constitution does not mirror exactly the U.S. Constitution, and our Privileges or Immunities Clause, best I can tell, is alive and well, unlike its federal counterpart.

[217] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

privileges would amount to nothing."[218] Judicial duty—"so arduous a duty," Hamilton called it—requires courts to be "bulwarks of a limited Constitution against legislative encroachments,"[219] including holding irrational anticompetitive actions unconstitutional. Such is life in a constitutional republic, which exalts constitutionalism over majoritarianism precisely in order to tell government "no." That's the paramount point, to tap the brakes rather than punch the gas.

The Court today rejects servility in the economic-liberty realm, fortifying protections for Texans seeking what Texans have always sought: a better life for themselves and their families. There remains, as Davy Crockett excitedly wrote his children, "a world of country to settle."[220]

_____

Don R. Willett
Justice

**OPINION DELIVERED:** June 26, 2015

---

[218] THE FEDERALIST NO. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

[219] *Id.* at 469.

[220] Letter from David Crockett to his children (Jan. 9, 1836), *in* H.W. BRANDS, LONE STAR NATION 332 (2004).